THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM ARGO, a/k/a Billy Argo, Defendant-Appellant.

Third District   No. 3—84—0666

Opinion filed May 14, 1985.

Robert Agostinelli and Thomas A. Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Rita Kennedy Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE HEIPLE delivered the opinion of the court:

At 4:58 p.m. on February 26, 1983, the Bolingbrook police department received an anonymous call from a male who reported that he had seen the body of a boy in the creek by Kildeer Apartments. A search of the area was unsuccessful. The police were informed by Mrs. Julia Knowles that her 10-year-old son, Donald Green, had not returned home that evening. The next afternoon, Green's unclothed body was found face down in Lily Cache Creek. Green's clothing was found scattered on the bank nearby. An autopsy revealed a single stab wound to the left chest which penetrated the heart. There was an abrasion on the right scapular area. There were scratches on the buttocks and feces near the anus.

The Bolingbrook police began an intensive investigation. Questioning of young boys in the area turned up the name of John Schwake as a reputed local child molester. One of Schwake's acquaintances among area boys was said to be defendant, Billy Argo. As of March 11, Schwake had not been questioned by the police.

On March 11, Officers Ranum and Steinke went to Argo's mother, Mrs. Robbie Kanizar, and received permission to bring Argo to the station for questioning. The officers sought information on Schwake and others who frequented the area by the creek. Argo, 14 years old at the time, stated that he knew Schwake and that Schwake had once made a sexual advance to him. As the conversation continued, Argo became increasingly agitated and experienced difficulty in speaking. As the officers were about to leave to give Argo time to regain his composure, Argo grabbed Ranum's hand and said something was bothering him. Argo eventually admitted to being present when Schwake molested and murdered Green. He then went to the bathroom and vomited.

When Argo returned to the interview room, he was read his *Miranda* rights from a preprinted form. He signed the form and initialed each line, indicating his understanding of his rights. Mr. and Mrs. Kanizar were asked to come down to the station. As Billy became calmer he gave a statement containing facts which only someone present at the scene of the crime could have known. Ranum and Steinke related the substance of Argo's statements to the Kanizars.

Investigators Wilkerson and Andalina were called in to interview Argo. Food and drink was offered. Argo indicated he was relieved that he had gotten the story off his chest. Despite the late hour, he remained responsive and alert. Mrs. Kanizar was brought in to hear the story and was told that her son was to be a witness and that she would be informed if charges were to be filed. Argo then gave a tape-recorded statement.

Argo's statement accused Schwake of the molestation and murder of Green with no assistance on his part. Schwake supposedly ordered Green, at knifepoint, to remove his clothing "or else." Green resisted. Green undressed with Schwake's assistance. After forcing Green to perform oral sex on him, Schwake rolled Green over and sodomized him. When he had finished, Schwake rolled Green back over and got back on top of him. Green continued arguing with Schwake. As Argo walked away, he looked back to see Schwake stab Green in the chest. Schwake threw the body in the creek and washed off the knife. Once Argo completed the taped statement he returned home.

On March 15, Andalina and Wilkerson went to the Kanizar residence and received permission to take Argo to the scene of the crime for a reenactment. Steinke and Ranum met the others at the scene. As they walked along the creek, Argo told the officers that Schwake had asked Argo if they "wanted to have some fun with the kid." Argo interpreted this to have sexual implications and answered in the negative. After reenacting the crime, Argo became quiet and reflective. Wilkerson asked him if something was bothering him. Argo responded that when Schwake rolled Green back over after sodomizing him, he told Argo to come over and have Green suck him. Schwake did not threaten Argo, but Argo felt that he should comply. After a minute, Argo got up to urinate in the creek. Argo further informed the officers that after the stabbing of Green, he assisted Schwake in throwing the body into the creek.

After making these admissions, Argo was taken to lunch by the officers. They then brought him to the Will County State's Attorney's office, where Argo repeated his revised story to Chief Felony Assistant Burmila and again to State's Attorney Petka. Argo told them that

his story was the truth and that he was willing to testify in court. As of March 15, all concerned considered Argo a witness in the pending case against Schwake. In August and September Argo was brought to the State's Attorney's office to prepare his testimony.

Sometime prior to November 17, an important witness against Schwake recanted her incriminating story and provided Schwake with a strong alibi. The authorities were skeptical of the veracity of this new evidence. Wilkerson thus sought and received permission to take Argo out of school to undergo a polygraph to confirm the truth of his accusations.

Argo was taken to the Department of Law Enforcement in Joliet. The procedure began with the polygrapher, Dennis Luporini, speaking with Wilkerson to learn the details of the case. Luporini then spoke with Argo alone for a while as a pretest interview. After some control tests, Luporini questioned Argo for real. At no time prior to or during the test was Argo informed of his constitutional rights. Wilkerson testified that Argo was not under arrest and was free to go at all times.

Luporini told Wilkerson that some of Argo's answers indicated deception. Wilkerson then went to Argo and indicated that some portions of his story did not appear to be correct. Argo then added new details. When Schwake asked him if he wanted to have fun with Green, Argo responded "maybe," as opposed to "no." He also aided Schwake in removing Green's clothing. As Schwake molested Green, Argo became excited and decided to participate in the sexual activity without prompting from Schwake. Finally, Argo admitted to preventing Green from fleeing and telling on them. It was while Argo was holding Green that Schwake stabbed him. Wilkerson indicated that he'd like to take another polygraph to verify Argo's revised story, but Luporini doubted an accurate reading could be taken given Argo's frame of mind. Wilkerson took Argo home and informed his mother that Argo had not been entirely truthful. He received permission to take Billy out of school the following Monday, November 21, for another polygraph. At some point between the two polygraphs, Wilkerson informed the State's Attorney's office of Argo's additional admissions.

On November 21, Andalina and Wilkerson picked Argo up at school and took him to Joliet. They arrived at 1:30 p.m. Between that time and 4 p.m., Luporini interviewed and polygraphed him. No *Miranda* warnings were given. After Luporini told Argo that his new polygraph indicated deception, Argo admitted to the stabbing of Donald Green. The officers were called in. At that point, the officers

considered Argo not free to leave. He was read his rights from a card and agreed to talk.

His first version of the occurrence had Argo and Schwake's roles transposed from his original account. Wilkerson expressed disbelief, since the police had information that Schwake was not at the scene. Argo then claimed sole responsibility for the crime. Wilkerson observed that the evidence suggested a struggle involving more than two people. Argo then indicated that his companion was Scott Maxwell, a boy who used to live near him. Wilkerson told Argo that Maxwell had already been interviewed and was not near the scene at the time. After some encouragement from Wilkerson, Argo broke down and admitted that his accomplice had been his stepbrother. The two had made a pact that if one were caught he would not tell on the other.

This interview lasted until 9 p.m. Argo was allowed to use the bathroom and to get something to drink. The investigators then took a taped statement. The statement began with Argo's acknowledging that he had been read his rights, understood them and had agreed to talk, with no threats or promises being made. To make a long story short, Argo thoroughly incriminated himself as the protagonist of the molestation and murder of Green. He was arrested immediately. The charges against Schwake were dropped.

A petition was filed in the juvenile court of Will County alleging Argo to be delinquent. Named as respondents were Argo's mother and his natural father, Willis Edward Argo, whose only known address was Houston, Texas. The State then petitioned to remove the cause and try Argo as an adult pursuant to the Juvenile Court Act (Ill. Rev. Stat. 1981, ch. 37, par. 702—7). An affidavit was filed alleging that, upon diligent inquiry, Willis Edward Argo could not be located. (In fact, subsequent testimony revealed that Billy Argo had not seen his natural father since 1976.) Consequently, a notice by publication ran in the Joliet Labor Record. A copy of the notice was mailed to "Willis Edward Argo, Houston, Texas." It was returned undeliverable due to an insufficient address. Following an extensive hearing, the court ruled that Argo was to be tried as an adult.

Argo filed a motion to suppress all statements made to the police on November 17 and 21. The motion alleged that the statements had been procured in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. It was also asserted that the confessions were not voluntarily made. The court denied the motion, finding that Argo was not in custody when the statements without *Miranda* warnings were made.

Argo was indicted on three counts of murder. One count was based on a killing with knowledge of a strong possibility of death or great bodily harm to the victim, while the other counts were based on a killing committed in the course of two separate acts of deviate sexual assault. Argo was convicted on all three counts and sentenced to three concurrent terms of 30 years' imprisonment.

■ Defendant's initial contention is that the failure to notify his natural father of juvenile court proceedings deprived that court of jurisdiction to transfer his case to the criminal court. The recent case of *People v. Taylor* (1984), 101 Ill. 2d 377, 462 N.E.2d 478, refutes this proposition. There, the court held that it was not a prerequisite to jurisdiction in a transfer case to notify an absent, noncustodial parent when the custodial parent had been served and was involved in the proceedings. The salient point as stated by the court is:

"the court was not trying to nor did it, issue any order or judgment against the absent natural father. That father's rights were not adjudicated or affected in any way by the adjudication of the delinquency petition." 101 Ill. 2d 377, 385.

Defendant cites *People v. R.S.* (1984), 104 Ill. 2d 1, 470 N.E.2d 297, in an attempt to distinguish *Taylor*. *R.S.* does not weaken the applicability of *Taylor*. In *R.S.*, not only was the record unclear as to which of the parents had custody, but the address of the allegedly noncustodial mother was known. Here, as in *Taylor*, the whereabouts of the natural father were unknown and the father had shown no interest at all in the minor. Defendant's argument that a diligent inquiry would have turned up the father's address is unconvincing. There is a scanty reference in the record to defendant's contacts with his paternal grandmother. Defendant thus asserts that a diligent inquiry by the Will County clerk of the grandmother would have unearthed the whereabouts of Willis Edward Argo. This is little more than speculation. Nothing in the record suggests that the grandmother or anyone else knew where Willis Edward Argo resided. Furthermore, as in *Taylor*, the action taken in the juvenile court was in no sense a judgment or order adjudicating the rights of the absent father. Thus, we cannot say that the failure to notify defendant's natural father deprived the juvenile court of jurisdiction to transfer this case.

■ Defendant's principal argument is that the court below erred in denying his motion to suppress his taped confession, his earlier statements to the police of November 17 and November 21, and the murder weapon, the location of which was revealed in defendant's November 21 confession. Defendant submits that his confession was the

product of statements taken from him in the course of custodial interrogation without the benefit of *Miranda* warnings. He further submits that his statements should have been suppressed because they were involuntarily made.

Taking the constitutional question first, the trial court concluded that defendant was not in custody when he made his unwarned, incriminating statements. A trial court's decision to deny a motion to suppress statements will not be reversed unless that ruling was contrary to the manifest weight of the evidence. *People v. Schultz* (1981), 99 Ill. App. 3d 762, 425 N.E.2d 1267.

Defendant's position is that as he continued to implicate himself further on November 17 and was shown to be deceptive in response to questions relating to the killer's identity on November 21, he at some point became the State's prime suspect as opposed to its star witness. Consequently, whenever this conversion occurred, defendant was effectively in custody and should have been given his *Miranda* warnings. Defendant's brief offers several possibilities as to when these warnings should have been given.

The reason that defendant cannot point to a specific time is because no such time existed until defendant actually admitted the stabbing of Donald Green. The testimony of the officers involved is consistent and unwavering. No one told defendant that he had to take polygraph examinations. No threats or promises were made to induce the taking of the examinations. Defendant was free to leave anytime he wished.

In *Oregon v. Mathiason* (1977), 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711, the Supreme Court considered the admissibility of statements made by a defendant who had voluntarily gone to the police station to answer questions. The court held that where the police had neither arrested defendant nor deprived him of his freedom of action in any significant way, he could not be considered in custody. In *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870, our Supreme Court modified the *Mathiason* test. The court held that the test is whether a reasonable person, innocent of the charges, would have felt deprived of his freedom of action in any significant way.

It is the "innocence" variation that disposes of defendant's contention. Had a reasonable person not in fact been the active participant in the instant crime, there would have been no question in his mind that the police were only preparing him as a potential witness rather than attempting to elicit incriminating information. Defendant may have subjectively believed he was not free to go because he feared the polygraph was exposing his guilty conscience to the exam-

iner. However, where the objective facts do not support a finding of a significant deprivation of freedom, we are powerless to infer such a condition based upon defendant's idiosyncratic beliefs.

While defendant may be able to point to a number of the objective factors enumerated in *People v. Savory* (1982), 105 Ill. App. 3d 1023, 435 N.E.2d 226, to support his contention that he was in custody, his argument remains unpersuasive. Before undertaking an analysis of the variety of circumstances cited in *Savory*, there must be a minimal showing of affirmative steps taken by the police to limit a suspect's freedom of action in some fashion. Otherwise, the essential language of *Mathiason* will be rendered meaningless:

> "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." (*Oregon v. Mathiason* (1971), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714.)

Also of interest is *California v. Beheler* (1983), 463 U.S. 1121, 77 L. Ed. 2d 1275, 103 S. Ct. 3517, where the court reversed a finding of custody based on the totality of circumstances where there was no showing of a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. There is no evidence of any such restraint in the record. Accordingly, the trial court's finding that defendant was not in custody until he admitted killing Donald Green is supported by the manifest weight of the evidence.

■ The closer question, not specifically addressed by the trial court, is whether defendant's statements were voluntarily made. In determining whether a confession is voluntary, it must be ascertained whether defendant's will was overborne when he confessed or whether the confession was made freely, voluntarily and without compulsion or inducement of any sort. (*Haynes v. Washington* (1963), 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336.) Such a determination should be based on the totality of circumstances surrounding the con-

fession (*People v. Noe* (1980), 86 Ill. App. 3d 762, 408 N.E.2d 483). Among the factors to be considered are the traits of the particular defendant and the details of the interrogation. *Schneckloth v. Busta-monte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.

Defendant points out a number of facts in support of his argument that his will was overborne. He was only 15 years old, with limited exposure to the criminal justice system. He was subject to prolonged questioning on two separate occasions without the benefit of *Miranda* warnings. He was in a "police dominated" atmosphere.

Even conceding the presence of these and other factors, the record points to the inescapable conclusion that the defendant confessed voluntarily. The police treated defendant with courtesy and respect at all times, particularly since he was at all times considered the key witness in an important upcoming prosecution. He was never threatened nor induced to talk. He was given the opportunity to go to the bathroom or get something to drink as he desired. All contacts were preceded by obtaining parental permission to speak to him. We concur with defendant's contention that his will to remain silent was shattered, but not for the reasons that he would assert. The obvious conclusion from the record is that defendant's will was internally overborne by his desire to stop lying and finally tell the truth about this horrible incident. Such a result was achieved neither intentionally nor inadvertently by the police. In fact, the manifest weight of the evidence supports the trial judge's finding that defendant's confession came as a complete surprise to the officers. Thus, while circumstances were present which weighed heavily on defendant's resolve to remain silent, we cannot say that the totality of circumstances contradicts a finding that the confession was neither coerced nor involuntarily made.

Defendant argues that he was denied a fair trial by the exclusion of evidence asserted to be favorable to his theory of the case. Defendant urged at trial that there was a reasonable doubt that his confession was any more truthful than his original story implicating Schwake. Defendant sought to introduce a copy of a traffic ticket received by Schwake on the day of the homicide. The copy had been obtained in a search of Schwake's home while Schwake was in prison awaiting trial. The copy appears to have been altered to reflect a different time of issuance. Defendant argues that this alteration was evidence of Schwake's consciousness of guilt. The State's motion *in limine* asserted that the evidence was both irrelevant and without foundation. The court granted the motion without indicating specific grounds.

■ Even assuming, *arguendo*, that the court erred in granting the State's motion, the error was harmless beyond a reasonable doubt. Defendant claims that the alteration permits an inference of consciousness of guilt. However, the alteration is susceptible to a competing inference that Schwake, falsely accused of a capital crime but without unshakable alibi, took steps to remedy this situation. Thus, both prosecution and defense could reasonably argue that this piece of circumstantial evidence supported its theory of the case. Consequently, the probative value of this evidence is limited. Therefore, in light of the overwhelming evidence against defendant stemming from his confession, this error must be deemed harmless.

■ Defendant's final argument is that the court erred in entering judgment and sentencing defendant for three counts of murder for a single act. Vacation of two of the convictions is sought, as well as a remand for resentencing, due to there being only one conviction properly before the court. The State concurs in part, but argues that we should affirm the conviction on count I and the 30-year sentence as well. We agree with the State. The judge's comments upon sentencing defendant indicate a reasoned weighing of factors in aggravation and mitigation in arriving at his sentence. There is nothing to indicate that the presence of additional separate counts was considered in any way. Accordingly, we decline to remand. (*People v. Sanford* (1983), 119 Ill. App. 3d 160, 456 N.E.2d 333.) The convictions on counts II and III are vacated. We affirm the judgment of the court on count I.

Affirmed in part; reversed in part.

BARRY and SCOTT, JJ., concur.