No. 22730.

Joseph Aguilar Gaitan v. The People of the State of Colorado.

(447 P.2d 1001)

Decided December 9, 1968.     Rehearing denied January 6, 1969.

BRENMAN, CIANCIO, ROSSMAN & BAUM, MARTIN ZEROB-NICK, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, ROBERT L. HOECKER, Assistant, JOHN P. MOORE, Assistant, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE GROVES.

THE plaintiff in error, referred to as the defendant, was convicted of aggravated robbery and conspiracy to commit aggravated robbery, and was sentenced to concurrent terms of 45 to 60 years for the former and 8 to 10 years for the latter. The principal assignment of error is that the prosecution was permitted to claim surprise with respect to three of its witnesses and to attempt to impeach them with the use of their prior statements which were highly incriminating against the defendant.

Guadalupe Salazar, a lady known as Lu, was a manicurist at a barber shop in Denver. On February 10, 1965 she had her Ford automobile parked near the shop, and her brother Virgil, who was without a driver's license, asked that a friend of his named Joe be per-

mitted to borrow the car. She agreed. Arrangements were then made for Joe to pick up the car. Mrs. Salazar had the shop porter place the keys in the car along with a note which read, "Joe — be careful with the car don't hang me up here before 6 if you have another car just leave the keys in glove compartment tell Virgil to call me. Lu." (The first name of the defendant is Joseph and he was known as Joe.) Someone drove the car away. Later that day the defendant accompanied by a "girl" entered the American Brokers and Produce Company store in Denver, inquired for a person who was not there, wandered around in the store, and left the premises. About fifteen minutes later two masked men wearing hats entered the same establishment, and committed an armed robbery; they fired a gun into a wall; they took a set of keys and a chapstick of an employee named Weiss; they also took currency in the approximate amount of $175 including a $50 bill, a camera, camera parts, a number of checks, and a bank pouch. Those present at the store were unable to identify the masked men. At about the time of the robbery a witness observed a man run from the store and jump into the back seat of a car in which a woman was already seated; and the witness watched the car speed away. Three days later this witness inspected Mrs. Salazar's car and identified it as the same one she had seen near the store. A short time after the robbery a police officer observed Mrs. Salazar's car parked in front of 3393 Arapahoe in Denver. This was a residence occupied by Mrs. Reyes, the mother-in-law of the defendant, and her son, Michael Atencio. Snow had recently stopped falling and the officer observed the tracks of two men and a woman proceeding from the car to the front door of the residence. He radioed for assistance and proceeded to the backyard. There he observed the tracks of two men and a woman leading from the backdoor. He followed these tracks and caught up with the person whose imprints were those of the female, and arrested her.

Apparently, the defendant was apprehended as a result of tracing the tracks. In any event, he was arrested very soon thereafter in the same general neighborhood. He had on his person Mrs. Salazar's note above quoted, the Weiss car keys and chapstick and $191 in currency, including a $50 bill. The remaining articles taken in the robbery were found on a table in the house at 3393 Arapahoe. Hats similar to those worn by the robbers were in Mrs. Salazar's car.

Mrs. Salazar, Mrs. Reyes and Atencio were questioned at police headquarters, and transcripts of such questioning were made. Mrs. Reyes and Atencio were questioned together. The transcript of the questioning of Mrs. Salazar disclosed that she had known the defendant, that Virgil had asked her to loan her car to the defendant and she agreed to do so, and that the note was addressed to the defendant.

Mrs. Salazar was called as a witness for the People. Her questioning brought out that she had made previous statements to the police — represented by a transcript — and that these statements were not true. No proper objections were made to any of this testimony. Later, the defendant called Mrs. Salazar as his witness and she testified that she had not known the defendant. On cross-examination, after laying a proper foundation, the People attempted to impeach her with her alleged previous statements. We find no reversible error in this procedure.

Several months prior to the trial Mrs. Reyes and Atencio went to Los Angeles. The district attorney's office encountered considerable difficulty in effecting their return for the trial. At the trial there was an *in camera* session relating to whether Mrs. Reyes might incriminate herself. During this session the prosecutor made statements to the effect that he did not wish to question her at that time for the reason that if she changed her answers, he would be unable in open court to claim surprise and impeach her.

According to the police transcript Mrs. Reyes and Atencio had stated that the defendant, a woman and another man had entered the house at 3393 Arapahoe shortly prior to the arrival of the officer, had left the articles on the table, and had departed by way of the backdoor when the officer drove up. The deputy district attorney called Mrs. Reyes to the stand and she testified that she did not see the defendant on the day of the robbery. He then claimed surprise and requested that he be allowed to impeach the witness with the use of the transcript of the questioning of the witness and Atencio. This he was permitted to do. Somewhat inexplicably to us, the judge required, preliminarily, that testimony be given to the effect that the questioning as set forth in the transcript in fact took place. Until this "foundation" had been laid, he would not permit inquiry of the witnesses as to whether during the questioning certain questions were asked and certain answers were given by them.

After such "foundation" testimony, the prosecutor recalled Mrs. Reyes to the stand and asked her whether the questions asked and the answers given by her as contained in the transcript were actually asked and so answered. In each instance with respect to an answer incriminating to the defendant, she denied having so answered or denied the truth of the answer. Atencio was called to the stand and was questioned in the same manner. He denied the truth of any statements which tended to incriminate the defendant. Later in the trial the People placed the police hearings reporter on the stand, who testified that she had recorded the questioning and made the transcript. From her shorthand notes she then read the contents of the police transcript in which Atencio stated that the defendant and others came to 3373 Arapahoe with the articles taken in the robbery and departed hastily upon the arrival of the officer.

The defendant's trial counsel objected to this testi-

mony only on the grounds that the prosecutor had not shown surprise and that it was difficult to tell from the transcript whether certain questions were answered by Mrs. Reyes or Atencio. Another attorney appearing here for the defendant argues, in addition to the point involving lack of surprise, that the testimony constituted a denial of the defendant's rights under the sixth amendment to the United States Constitution to confront the witnesses at the time they made the alleged statements.

While the prosecutor had in mind the possibility of surprise and wished to guard against it, it is conceded that he was not told by either Mrs. Reyes or Atencio that they would testify contrary to their previous statements. He was aware that these witnesses were hostile and that he would possibly have difficulty in his examination of them. However, absent a forewarning of a witness' intention to repudiate a prior statement, knowledge before trial that a witness is hostile does not preclude a claim of surprise when a witness testifies contrary to a previous sworn statement. *State v. Duffy,* 134 Ohio St. 16, 15 N.E.2d 535. See also *Wheeler v. U.S.,* 211 F.2d 19. Nor is the fact that the deputy district attorney was aware of Mrs. Reyes' intention to claim her fifth amendment privilege enough to preclude a claim of surprise. Mrs. Reyes, after being advised by competent counsel not participating in the case, in fact waived her privilege against self-incrimination. In such circumstances the prosecutor was entitled to assume that the witness would testify in accordance with the statements she had previously given. *Carrado v. U.S.,* 210 F.2d 712.

Neither was there any deprivation of constitutional rights in allowing the witnesses to be impeached by their previous statements. In *Pointer v. Texas,* 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed.2d 923, and *Douglas v. Alabama,* 380 U.S. 415, 85 S. Ct. 1074, 13 L. Ed.2d 934, it was held that the right of cross-examination secured

by the confrontation clause of the sixth amendment of the United States Constitution is guaranteed to an accused in a state court under the fourteenth amendment. However, there were distinguishing factors in these two cases. In *Pointer* the witness was not in court and was out of the state. In *Douglas* there was no opportunity for cross-examination as to the witness' previous inconsistent statements because he was allowed to invoke the fifth amendment. Here neither witness invoked the fifth amendment and there was opportunity to cross-examine them as to both their previous and present statements.

We are inclined to think that it would have been more commendable practice for the deputy district attorney to have ascertained "surprise" in advance during the *in camera* session. The result then would have been that he would not have called Mrs. Reyes and Atencio as witnesses, whose testimony actually was not needed to support a conviction. However, we find no reversible error in his conduct.

We find the other assignments of error to be without merit.

The judgment is affirmed.

MR. JUSTICE DAY and MR. JUSTICE PRINGLE concur.