UNITED STATES of America ex rel. Johnnie L. SAVORY, Petitioner–Appellant,

v.

Michael LANE, Director, Illinois Department of Corrections, Respondent–Appellee.

No. 85–2467.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1987.

Decided Oct. 30, 1987.

Theodore A. Gottfried, State Appellate Defender, Springfield, Ill., for petitioner-appellant.

David E. Bindi, Atty. Gen., Chicago, Ill., for respondent-appellee.

Before WOOD and CUDAHY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

Petitioner was convicted of two counts of murder in state court, after a retrial following reversal of his original convictions necessitated by the introduction of an improperly obtained confession. In his direct appeal, the Illinois Appellate Court held that the admission at his trial of an inconsistent exculpatory story violated *Miranda* and that the admission of evidence of and prosecutor's comments on the defendant's refusal to talk to police when first asked about the murders was erroneous under state law (declining to decide whether such errors also violated the United States Constitution). However, it also held that the errors were harmless beyond a reasonable doubt, because it found that three witnesses had testified to defendant's admissions of guilt. Petitioner sought and was denied state post-conviction relief on grounds not relevant to this appeal. Petitioner then sought a writ of habeas corpus in the district court, under 28 U.S.C. § 2254 (1982). The district court accepted the Illinois Appellate Court's conclusion that the errors were harmless and denied the writ. Because we agree that the complained-of errors were harmless beyond a reasonable doubt, we affirm.

### I

A. State's Evidence Independent of the Claimed Constitutional Violation

On the morning of January 18, 1977, two teenagers, James "Scopie" Robinson and his sister Connie Robinson, were brutally murdered. Each suffered multiple stab wounds—Connie's were so severe that her viscera protruded from them. Police discovered the bodies that afternoon at between 4:30 and 4:45 p.m. The bodies were first discovered shortly after 4:30 p.m. by one James Douglas, the ex-husband of the children's mother, Noyalee Robinson. Police were notified and arrived at the scene a short time later. The defendant, Johnnie Lee Savory, who was fourteen years old at the time of the murders, was an acquaintance of Scopie's and had been at the Robinson home the night before. He left the Robinson home sometime between 10:00 and 11:00 that night, leaving behind a bottle of clear nail polish that belonged to him and was later found by police at the scene. Mrs. Robinson and her ex-husband testified that the victims were alright at that point in time and were sleeping the next morning at between 6:30 and 7:00 a.m., when the two adults left for work. One of Connie's friends had tried to call her from approximately 9:00 a.m. onward on the day of the murders. The coroner's report was con-

sistent with a time of death for the two youths of sometime before 9:00 in the morning.

When police arrived at the scene, they observed several things which were inconsistent with the condition of the household when the adults left (according to their contemporaneous statements to police and later testimony). In particular, the television had been removed from a stand on which it was usually placed and set on the floor with the screen facing the wall. Additionally, two large sticks of the type which might be used in practicing martial arts were found on the floor, one of them near Scopie's body. An empty beer can and a container of crackers were found on the kitchen floor. Also, a vacuum cleaner was blocking the entrance to Connie's bedroom, where the two bodies were found. Finally, the keys to the house were found on the floor in the room with the television. Mrs. Robinson testified at trial that the keys were usually left in the house so long as any family member was home, but were then usually placed in the mailbox when the last person departed.

Other aspects of the scene were not observed by police, because they had been altered before the arrival of police on the scene, but were recounted to police by Douglas, Noyalee Robinson, or their landlord and his employee, who had returned to the house before police arrived to assist Douglas. These included the fact that the phone in the room where the bodies were found had been off the hook and had blood on it. Also, Connie's two-year-old child had been found, alive, in the other bedroom, but he had been removed from the house by Douglas.

After police made general observations of the scene and took statements from the witnesses then present, they called for the coroner and police laboratory technicians to gather physical evidence. Blood later determined to be of the same types (O and A) as that of the victims was found in numerous locations in the house, including on the light switch in the bathroom. Additionally, traces of blood were found near the bathroom sink through a technique called "Lu-minol" testing, but the type could not be identified. Several hair strands were also found in the bathroom sink, some of which were later determined to be consistent with the hair of the defendant. Noyalee Robinson and Douglas both testified that Savory had not entered the bathroom on the night before the murders and both recalled using the sink that morning and running water in it.

Other physical evidence was collected from the defendant or his father. A blue pair of pants was collected from defendant's father and was found to have type A blood on it. The ownership of the pants was in dispute at trial, with the father testifying that they were his and that the blood was from an accident in which he had injured his leg (no evidence of the father's blood type was introduced). Additionally, a knife belonging to the defendant was found to have blood on it, but the type could not be determined. The knife was black in color and had a smooth, rather than a serrated, blade. According to the coroner, a smooth bladed knife had inflicted the fatal wounds.

Finally, the state introduced evidence of several admissions the defendant had allegedly made to third parties on the day of the murders. Ella Ivy testified that she had spoken to the defendant at between 2:30 and 3:00 on the afternoon of the murders and that he had said that he had been at Scopie's house, that he and Scopie had been practicing Karate, and that he had "accidentally cut him or something, by accident. But he was all right when he left." She further testified that the defendant had returned to her house sometime before 4:00 the same afternoon and told her that Scopie and his sister were dead. She then testified that he had left and was not home when her brother and sister arrived at 4:15, but that he returned again around 4:30 (before the news came on) and that he told her that the baby was in the house with Scopie. According to her, "[f]irst he told me that the baby was in the oven. And then he retracted and said the baby was in the bedroom with the dog." She also testified that he stayed with the Ivy's that

night, and that he had a black knife in his possession.

Frank Ivy testified that he had returned to the Ivy home after school at approximately 3:45 on the afternoon of the murders and that the defendant was not there at that time. He testified that the defendant came to the home at about 5:30, and that they watched a news account of the murders on television. He further testified that the defendant returned to the Ivy house at about 8:00 that evening and told him:

A. "We was practicing Karate."

Q. Who was practicing Karate?

A. Scopie and him. And he accidentally stabbed him.

Q. Did he say anything concerning Scopie's sister at all?

A. She came in the room and he stabbed her, I guess.

R.Vol. VII at p. 407.[1]

Finally the state called Tina Ivy, who testified that she had seen the defendant at her house on the afternoon of the murders at about 2:30 and that the two had gone to catch a bus to school. She testified that while they were waiting on the bus, which arrived at 3:00, the defendant had left twice: once to go to his house and put on a jacket and another time, when she did not see where he went (although he walked in the direction of his house, rather than hers). She further testified that at around 7:00 that evening he told her that "two kids had got killed." She also said that he told her "[t]hat him and Scopie had been together earlier that day doing Karate. And that he had accidentally cut Scopie." She also testified to a conversation which allegedly took place with the defendant on the following day:

Q. What, if anything, did he tell you at that time?

A. That, you know, he didn't know who could have did that to the kids, you know. Whoever did it, they had to know him, because the dog that they had wouldn't allow strangers in the house.

Q. What, if anything, else did he tell you?

A. That Scopie's sister had been split wide open. And that he was brutally stabbed, too.

R.Vol. VIII at p. 426–427.

### B. Defendant's Evidence

The defense consisted of two principal parts. First, the defendant attempted to establish an alibi defense by calling witnesses who testified that he had been with them on the morning of the murders. Secondly, the defense attempted to show that other people, most notably Douglas, had a motive and the opportunity to commit the murders. Specifically, the defense attempted to show that Douglas was having an illicit affair with Connie and that he had had prior altercations with both Connie and Scopie, in one of which Scopie had attacked Douglas with a pair of scissors. Additionally, the defense introduced evidence that Douglas had been in Vietnam and was shell shocked and that he was a cocaine addict, both of which on occasion resulted in abhorrent and possibly violent behavior. The defense also introduced evidence that Douglas worked at a mortuary and "loved to cut on bodies," although Douglas denied having made such a remark and testified that he was only a driver for the mortuary. The defense also adduced evidence from the coroner that the wounds on the bodies would be consistent with those inflicted by a mortician's knife (or any other knife with a smooth blade).

Additionally, the defense presented testimony of neighbors of the Robinsons that they had seen two unidentified adult black males in a car outside the Robinson house

---

1. At trial, a tape of an earlier interview with Frank Ivy, in which the alleged conversation described in the text was conspicuously omitted, was played for the trial judge. The trial court ruled that, despite foundational problems, the defendant could produce the conversation, through the testimony of defense counsel's investigator, who conducted the interview. This was not done, however, so the jury never heard the impeachment. This omission on the part of defense counsel formed the basis for one of defendant's "ineffective assistance" claims in his state post-conviction petition. That claim was rejected by the district court, and its rejection was not appealed.

on the morning of the murders at around 8:30.

## C. Evidence and Argument Challenged

In addition to the evidence detailed above, the state presented evidence that when police first asked to interview the defendant on January 25, 1977, a week after the murders, he told them that "he didn't want to talk about it, he didn't want to make any statements." R.Vol. VIII at p. 437. The prosecutor emphasized this statement in closing argument:

> I believe you heard that on that date of January 25th, 1977, Officers George Pinkney and Edgar Hanes went to the Late Afternoon School to talk to Johnnie Savory, who they thought might have some information regarding the case. They asked him that afternoon about 3:30, they wanted to talk to him about Scopie, what he might know. The Defendant, what did he say at that time, ladies and gentlemen? "I don't want to talk about it. I won't make any statements." This, ladies and gentlemen, the apparent good friend of his, he doesn't want to talk about it, doesn't want to help the police at that time. . . .

R.Vol. VIII at p. 704.

In addition to this remark and evidence, the state introduced evidence of conflicting exculpatory statements made by the defendant. After his initial reluctance to talk to the police, the defendant was persuaded to cooperate. He told police that he and Scopie had been practicing Karate with knives the night before, and that they had moved the television set. He told them that he and Scopie had prepared and eaten corn and hot dogs. He also told them that he had called Scopie after he returned home that night and had talked to him until sometime after one o'clock in the morning. He stated that he had planned to meet Scopie the next morning, but had not gone because he had slept until 10:00 and went immediately to the hospital to see his grandmother. He also told police that he had heard a report on the radio at about 4:30 on the afternoon of the murders while he was in the principal's office at his school. During the period these statements were obtained, according to the Illinois Appellate Court, the defendant was not in custody, and, therefore, the admission of these statements was not error. *People v. Savory*, 105 Ill.App.3d 1023, 1029, 61 Ill.Dec. 737, 742, 435 N.E.2d 226, 231 (1982). Defendant does not challenge this holding.

The defendant was then confronted with the fact that many of the details of his story did not match things the police had learned from others. For example, Mrs. Robinson had said that she had cooked the corn and hot dogs and left them on the stove for her children and that the television had been on its stand both the night before and when she left for work on the morning of the murders. The defendant admitted that he had lied about these facts, but he could not explain why. The Illinois Appellate Court held that this later interrogation was custodial and therefore, admission of the statements then obtained violated *Miranda.*

The prosecutor emphasized the inconsistencies between the other evidence (principally the testimony of Noyalee Robinson and Douglas) and the story defendant told the police at length. See R.Vol. VIII at pp. 704–710. Then the prosecutor went on to contend that the lies the defendant had told to police had some truth in them. The prosecutor suggested that the defendant and the victims did in fact eat a meal, including corn, that morning (the contents of the victims' stomachs indicated that they had consumed corn roughly an hour to an hour and a half before their deaths). He also suggested that the Karate incident, including the moving of the television, had taken place in the morning of the 18th, rather than the night of the 17th. Then, according to the state's theory:

> . . . Scopie began to get the best of Johnnie Savory. And Johnny Savory could not be bested by anyone, including Scopie. At that time is when the Defendant pulled out the knife, which he described as razor sharp, he began using that in his combat. At that time, whether accidentaly [sic] or intentionally, he stabbed Scopie, James Robinson. He

saw what he had done, ladies and gentlemen, and I would suggest to you that he went besirk [sic]. If you examine the photographs of the bodies in this case, this is not the act of a sane person at that time. He went besirk [sic] ladies and gentlemen, filled with rage.

R.Vol. VIII at p. 713.

### D. Appeal, State Post-Conviction Proceedings, and Habeas Corpus

On defendant's direct appeal, the Illinois Appellate Court held that the admission of the defendant's statements to police was a violation of his *Miranda* rights, and the admission of his refusal to talk to police was erroneous under state law (the court was presented with, but declined to decide, the constitutionality of the action). However, the court held the errors "harmless beyond a reasonable doubt" in light of its view of the record. According to the court, "three acquaintances of defendant testified that he had told them on the day of the murders that he had stabbed the victims and they were dead. These admissions by defendant were made at a time when the bodies had not yet been discovered and included descriptions of the victims' multiple stab wounds...." *People v. Savory*, 105 Ill.App.3d 1023, 1027, 61 Ill.Dec. 737, 740, 435 N.E.2d 226, 229 (1982). Thus, the Appellate Court concluded "In view of the testimony of the three witnesses who related defendant's admissions to them of his presence and complicity in the killings, we consider the admission of these statements in trial to be harmless error beyond a reasonable doubt." *Id.* at 1030, 61 Ill.Dec. at 742–43, 435 N.E.2d at 231–32. The defendant sought, and was denied state post-conviction relief on the grounds that two of the three witnesses referred to had recanted their testimony, and that he had received ineffective assistance of counsel.

It is unclear from the district court's opinion whether it made an independent determination of the harmlessness of the errors or merely relied on the state court. For example, the district court referred to the presumption of correctness found in 28 U.S.C. § 2254(d). *United States ex rel. Savory v. Lane*, No. 84–C–8112, Mem. op.

at 3–4 (N.D.Ill. June 25, 1985) [Available on WESTLAW, DCT database]. Additionally, the opinion seemed to imply that the errors were merely violations of state evidentiary rules. *See id.* at 4 ("an evidentiary ruling is not cognizable in a federal habeas proceeding unless the erroneously admitted evidence so tainted the trial that it was fundamentally unfair") (citations omitted). Finally, the opinion seemed to say that so long as the state court decisions considering the federal issues did not themselves constitute a violation of due process, federal habeas corpus review was unavailable. *Id.* at 5.

## II

We first consider the proper standard of review by which we are to evaluate petitioner's contentions. There are two different questions we must answer: first, whether the "harmless beyond a reasonable doubt" standard or some other standard applies to the trial errors, and second what deference, if any, we owe to the state court determination that the errors were harmless.

## A

With respect to the admission of statements petitioner made to police without the benefit of the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the standard for harmless error need not detain us long. Errors of constitutional magnitude are grounds for reversal unless they are "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also, e.g., United States ex rel. Miller v. Greer*, 789 F.2d 438 (7th Cir.1986) (en banc), *rev'd on other grounds,* — U.S. ——, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); *see also United States ex rel. Allen v. Franzen*, 659 F.2d 745, 748 (7th Cir.1981). While the state suggests that perhaps some other standard is appropriate to habeas corpus actions, the law in this circuit is plainly otherwise. Although the Supreme Court was presented with an opportunity to re-

solve this issue in *Miller,* it found it unnecessary to reach the issue, holding instead that there had been no constitutional violation at all. —— U.S. at —— n. 6, 107 S.Ct. at 3108 n. 6; cf. *Id.* at ——, 107 S.Ct. at 3110 (Stevens, J., concurring) (advocating less demanding standard for collateral review). Accordingly, the "harmless beyond a reasonable doubt" standard remains the law in this circuit, even where the errors are challenged on collateral review.[2]

The prosecution's use of defendant's refusal to talk to police as evidence of guilt requires only slightly more discussion. The state attempts to suggest that this was merely a state law evidentiary violation, subject to federal review, if at all, only within the broad bounds of "fundamental fairness" required by the due process clause. *See* Resp.Br. at 5–7 & n.*. We must disagree with this characterization.

Because appellant did not take the stand, and the state's purpose in referring to appellant's silence was to suggest that he was guilty (rather than to impeach his testimony), the problem does not involve the application of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), as the state seems to imply, but rather involves the application of *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). That case held that neither the prosecutor nor the court may invite the jury to draw an inference of guilt from an accused's failure to take the stand. This court has specifically held that where impeachment by silence is permissible, the government may not argue that a defendant's silence is inconsistent with a claim of innocence. *United States v. Shue,* 766 F.2d 1122, 1130 (1985). The Court noted that while a slight suggestion of guilt is inevitable when the government uses silence as impeachment, "the slight suggestion of guilt is grudgingly permitted only because the government needs to impeach

the defendant's preferred reason for remaining silent." *Id.* at 1131.

■ While it is true that *Griffin* involved governmental use of the defendant's silence at trial, rather than when initially questioned by police, and *Shue* rested on Due Process grounds, rather than on the right to be free from self-incrimination, we do not believe these factors make a difference. The right to remain silent, unlike the right to counsel, attaches before the institution of formal adversary proceedings. *Compare United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984) (right to counsel under Sixth Amendment does not attach until the defendant becomes an *"accused"* within the meaning of that amendment) *with* U.S. Const.Amd. V ("No *person* shall ... be compelled in any criminal case to be a witness against himself...."). Nor does *Shue*'s use of the more general "fundamental fairness" rationale for invalidating the action imply rejection of the proposition that the state's use of a defendant's silence as substantive evidence of guilt violates the more specific prohibition against compelled self-incrimination. In this respect, we believe *Griffin* remains unimpaired and applies equally to a defendant's silence before trial, and indeed, even before arrest.

Thus, the case is distinguishable from the cases the state cites such as *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) and *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), where the government used the defendant's silence to impeach his trial testimony. After all, there is no constitutional right to commit perjury, which impeachment is designed to detect. Because of this, the *Doyle* rule is predicated on the implied promise of the *Miranda* warnings. The cases which have allowed impeachment by silence rely on the fact

2. Even were we not so clearly bound by precedent, we would reach this conclusion. Because most constitutional errors involving the rights of criminal defendants occur in state trials (if only because of their sheer number), applying the standard on direct review only would either place the harmless constitutional error inquiry solely in state court hands or make the standard

of review depend on the fortuity of whether the United States Supreme Court grants certiorari in a particular case. *Cf. Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (challenges under Fourth Amendment exclusionary rule not available on collateral review). We decline to adopt such an arbitrary rule absent a clear signal from the Supreme Court.

that the defendant opens himself to impeachment by taking the stand. See *Fletcher*, 455 U.S. at 605–06, 102 S.Ct. at 1311–12; *Jenkins*, 447 U.S. at 235–36 & n. 2, 100 S.Ct. at 2127–28 & n. 2. There is, on the other hand, a constitutional right to say nothing at all about the allegations. While the presence of *Miranda* warnings might provide an additional reason for disallowing use of the defendant's silence as evidence of guilt, they are not a necessary condition to such a prohibition.

■ In sum, we believe that the state's suggestion that use of a defendant's silence to impeach his trial testimony presents a constitutional issue, but use of his silence to imply guilt does not, is nothing short of incredible, given the language of our constitution and the interpretation it has been consistently given. Because we find the error in referring to the defendant's silence to be of constitutional magnitude, we review it under the "harmless beyond a reasonable doubt" standard.

**B**

We also must decide the effect, if any, of the presumption of correctness that we must generally apply to state court findings under 28 U.S.C. § 2254(d).[3] As we have noted, the district court's opinion is ambiguous on this point. It may have accorded a presumption of correctness to the Illinois Appellate Court's finding of harmless error, as certain passages of the opinion seem to do, or it may have merely expressed agreement with the Illinois Appellate Court's conclusion. *Compare* slip op. at 3–4 ("However, 28 U.S.C. section 2254 notes that the state court finding 'shall be presumed to be correct' unless specific instances of misconduct or errors which denied the prisoner due process are found to exist at the state level.") *with id.* at 5 ("This court agrees with the state court finding that the constitutional errors

made at trial were harmless beyond a reasonable doubt.").

Application of the presumption of correctness to the conclusion that the errors were harmless would be error. At the risk of stating the obvious, we note that whether a constitutional error is harmless is not only a federal question, but one of federal *law*, and not of fact. We have held repeatedly that "mixed" questions of law and fact are subject to independent federal review, unaffected by the § 2254(d) presumption. *E.g. Woods v. Clusen*, 794 F.2d 293, 299 (7th Cir.1986) (voluntariness of confession) (citing *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)); *United States ex rel. Smith v. Lane*, 794 F.2d 287, 289 n. 3 (7th Cir.1986) (performance and prejudice components of ineffective assistance of counsel claim) (citing *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984)); *United States ex rel. Duncan v. O'Leary*, 806 F.2d 1307, 1314–15 (7th Cir.1986) (validity of waiver) (citing *Nash v. Israel*, 707 F.2d 298, 301 (7th Cir.1983)); *see also Harrison v. Benton*, 430 F.Supp. 717, 719 (W.D.Okla.1976) (State court conclusion that constitutional error was harmless "is, of course not binding on this court"). While the law/fact dichotomy is far from self-explanatory, we believe that questions, such as harmless error, that are *always* determined by the court fall safely on the "law" side of the line. *See United States ex rel. Tonaldi v. Elrod*, 782 F.2d 665 (7th Cir.1986) (adopting functional approach).

■ This does not mean that the presumption is totally inapplicable, however. Like many "legal" determinations (sufficiency of the evidence being one that immediately comes to mind), a decision whether an error was harmless or not requires a full examination of the facts and circumstances of the case. In the course of this

---

3. 28 U.S.C. § 2254(d) reads, in pertinent part:
In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue ... shall be presumed to be correct, unless the applicant shall establish or it shall otherwise shall appear, or the respondent shall admit—
(8) ... the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record....

undertaking, state courts frequently will make subsidiary factual determinations, en route to the ultimate conclusion. Such subsidiary findings are entitled to the presumption of correctness, provided that the other conditions of § 2254(d) are met. *See Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (per curiam); *Smith*, 794 F.2d at 289 n. 3; *Woods*, 794 F.2d at 299. The subsidiary findings in this case are the Appellate Court's findings that "three acquaintances of defendant testified that he had told them on the day of the murders that he had stabbed the victims and they were dead"; that "these admissions by defendant were made at a time when the bodies had not yet been discovered and included descriptions of the victims' multiple stab wounds"; and that "the witnesses ... related defendant's admissions to them of his presence and complicity in the killings." Provided the other conditions of § 2254(d) were met, we must accord these findings a presumption of correctness.

However, the other conditions were not met. In particular the Appellate Court's findings are "not fairly supported by the record." 28 U.S.C. § 2254(d)(8). Only one of the witnesses, Ella Ivy, related a conversation regarding the victims which allegedly took place before the bodies were discovered. Additionally, it was only to this witness that the defendant allegedly made the admission that the victims were dead. This witness, in particular, seemed to be confused about the times at which defendant spoke to her, or at least her testimony was inconsistent with that of another of the witnesses upon whose testimony the state relies. Although she testified that the defendant admitted the death and details about the baby and the dog at around 4:00 and 4:30, respectively (also testifying that he was not there at 4:15 when the other two witnesses arrived), her brother testified that he had returned to the home at 3:45, and that the defendant was not there at the time and did not arrive until 5:30.

The other two witnesses testified to admissions allegedly made *after* the brother and the defendant watched a television news account of the slayings. Tina Ivy's testimony, the only testimony that could even arguably be classed as containing a "detailed description" of the wounds the victims suffered, related a conversation which took place *on the following day*, well after the bodies were discovered. Only Frank Ivy's testimony contained any reference to the sister ("She came in the room and he stabbed her, I guess.").

In sum, the record does not support the assertion that defendant admitted to three witnesses that he had stabbed the victims and they were dead before the bodies had been discovered, or that he gave detailed descriptions of the wounds before that discovery. Neither do they support the statement that he admitted his presence and complicity in the killings. The testimony of the Ivys thus had significantly less probative force than the Appellate Court's summary suggests. Accordingly, we cannot accord a presumption of correctness to that court's findings.

### III

■ However, even independently reviewing the harmless error question and recognizing the problems with the Ivy testimony, we believe the errors were harmless beyond a reasonable doubt.

In order to conclude the errors were harmless, we must conclude that they were "harmless beyond a reasonable doubt." *Chapman.* This, in turn, means that we must determine " 'whether there is a reasonable possibility that the [errors] complained of might have contributed to the conviction.' " *United States ex rel. Ross v. Fike*, 534 F.2d 731, 734 (7th Cir.1976) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). In *Shue*, for example, we declined to hold a prosecution reference to the defendant's postarrest silence harmless, noting that the defendant's story "is unlikely-sounding but not obviously absurd. A rational jury could have believed it and could have reconciled the supposed inconsistencies." 766 F.2d at 1133. The inquiry, we have noted "is whether absent the constitutionally-for-

bidden evidence, honest and fair-minded jurors might very well have brought in not-guilty verdicts." *Burns v. Clusen,* 798 F.2d 931, 943 (7th Cir.1986) (citing *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828). "The fact that there was some incrimination or circumstantial evidence does not render the error harmless." *Id.* (citing *United States ex rel. Burke v. Greer,* 756 F.2d 1295, 1302 (7th Cir.1985). Typically, we require other evidence of guilt to be "overwhelming" before concluding a constitutional error was harmless. *See id.* (citing *Shue* ).

In light of the state's otherwise strong case, the relatively limited use of tainted evidence, and the lack of probative value the tainted evidence had, we conclude that there is no reasonable possibility that its use contributed to the verdict.

The problems we have noted with the Ivy testimony should not obscure the fact that the defendant did admit to all three that he had been at the Robinson residence on the day of the murders, a fact which was corroborated by the physical evidence in the case. Additionally, while Ella Ivy's testimony may have been in error about times, she was unequivocal about the admissions the defendant made. In the same manner, the testimony of both Frank and Tina Ivy, even though it concerned statements made by Savory after the murders had been discovered and were known to the public, still detailed admissions by the defendant generally consistent with those he made earlier to Ella Ivy and included inculpatory statements regarding both victims that linked Savory with the crimes. These admissions by the defendant tying him to both crimes mesh with the testimony of the several police and medical witnesses, all of whom testified as to their independent conclusions that the two homicides had been committed at approximately the same time, by the same person, using the same weapon.

The physical evidence, too, was damning. A knife belonging to the defendant (and similar to one described by Ella Ivy as being in the defendant's possession on the afternoon of the day of the murders) tested positive for the presence of blood. The strands of hair that were consistent with that of the defendant could not have been left on the bathroom sink the previous eve-ning, because as both Mr. Robinson and Mrs. Robinson testified, Savory had not entered the bathroom during his short visit to the Robinson home on the evening of January 17, 1977. Both Mr. and Mrs. Robinson also testified that they had run water in the bathroom sink the next morning, prior to the murders. Additionally, pants which were taken from the defendant's residence (although ostensibly belonging to the defendant's father) had blood on them that matched the blood type of one of the victims.

Finally, the testimony pertaining to the statements made by the defendant to the police which was not erroneously admitted established that Savory had described the scene as it existed following the murders, not as it had existed on the night before. The other evidence reveals that Savory had no basis for knowing of the corn and hot dogs and could not have been aware of the location and position of the television set unless he had been present in the victims' home the morning of the murders. In its closing argument at trial the prosecution emphasized the connection between the defendant and the murders established by these statements. Savory's subsequent admission that portions of the statements were false and his earlier refusal to cooperate with the police do not diminish the probative value of this evidence.

Although the defendant produced evidence of both an alibi explaining his whereabouts at the time of the crime and evidence suggesting that some other person may have committed the murders, the jury was not required to believe this evidence (indeed the alibi was extensively and effectively impeached by the state). We do not believe there is any reasonable possibility that the state's reference to the defendant's silence and his admissions that he had lied to police had any effect on the verdict.

## IV

For the reasons stated above, the judgment of the district court is

Affirmed.