The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Claire C. WELSH, Defendant–Appellant.

No. 98CA2167.

Colorado Court of Appeals,
Div. V.

April 11, 2002.

Certiorari Granted Nov. 18, 2002.

Ken Salazar, Attorney General, Elizabeth Rohrbough, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Karen N. Taylor, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CASEBOLT.

Defendant, Claire C. Welsh, appeals the judgment of conviction entered upon a jury verdict rejecting her insanity defense and finding her guilty of first degree murder after deliberation. We reverse and remand for a new trial.

When defendant's boyfriend attempted to end his romantic relationship with her, defendant went shopping for a handgun, but she was unable to purchase one because she lacked appropriate identification. She obtained the identification, returned to the gun store the next day, and purchased a revolver.

The following day, defendant arose early and drove her car to her cousin's residence, left the car in front of the cousin's house, and dropped the car keys into the cousin's mail slot. She took the revolver from the car, walked back to the apartment she shared with the victim, undressed, got back into bed, and shot him in the back of the head while he was asleep.

Later that day, defendant called and asked her cousin to come to the apartment and then call 911 upon her arrival. When she reached the apartment, the cousin found defendant lying on the floor, naked, bloody, and in a fetal position.

Officers responding to the scene observed that defendant had a gunshot wound and found the victim lying in his bedroom with a revolver on his chest. Lividity patterns later disclosed that the victim had been dead and lying on his left side for some time before his body was moved.

Police initially assumed defendant was the victim of an assault. Defendant answered questions about her name and that of the victim, but remained silent in the face of questions about what had happened. She was transported to the hospital and treated, where she continued to remain silent when detectives and medical personnel asked her what had happened.

The day following the shooting, a detective found and impounded defendant's car without obtaining a warrant. The detective got the keys from defendant's cousin, and when the tow truck operator opened the vehicle to straighten the wheels, the detective shined his flashlight inside and observed a gun box on the passenger side of the vehicle. The box and incriminating documents were later seized from the vehicle and introduced at trial.

Defendant pleaded not guilty by reason of insanity. When being evaluated by psychiatrists, defendant told them she did not remember the shooting.

Two prosecution psychiatrists testified that, although defendant was suffering from depression and a borderline personality disorder, she was not psychotic and had the ability to know right from wrong at the time of the shooting. A defense psychologist opined that defendant was deeply depressed, perhaps psychotically so, and showed signs of contemplating suicide. A defense psychiatrist opined that defendant was psychotically depressed, that she dissociated at the time of the shooting, that she suffered from a severe personality disorder, and that she was legally insane at the time of the shooting. He stated that defendant did not have the capacity to distinguish between right and wrong and did not have the ability to form the necessary culpable mental state.

I.

■ Defendant contends that the trial court violated her Fifth Amendment right to

be free from compelled self-incrimination by permitting the prosecution to introduce evidence of her pre-arrest silence as substantive evidence of her sanity and guilt and to comment upon it during opening statement and closing argument. We agree.

■ Both the Fifth Amendment and article II, § 18 of the Colorado Constitution provide that no person shall be compelled to testify against himself or herself in any criminal proceeding. The Fifth Amendment, however, not only protects the individual from being involuntarily called as a witness against himself or herself, but also grants a privilege not to answer official questions put to him or her in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him or her in future criminal proceedings. *See Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973).

### A.

The Supreme Court has not decided whether the use of a defendant's pre-arrest silence as substantive evidence of guilt or sanity violates the Fifth Amendment. Relying upon *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the People argue that we need not determine that issue here because defendant's failure to answer questions about the shooting was admitted not as substantive evidence of her guilt, but to show that her silence was inconsistent with her later statements that she did not remember the shooting. We disagree.

In *Jenkins,* the Court held that the Fifth Amendment is not violated by the use of pre-arrest silence to impeach a defendant's credibility when the defendant takes the stand at trial. The Court reasoned that, although it "can be argued that a person facing arrest will not remain silent if his failure to speak later can be used to impeach him," once a defendant chooses to take the stand and testify, that defendant has an obligation to testify truthfully. *Jenkins v. Anderson, supra,* 447 U.S. at 236, 100 S.Ct. at 2128, 65 L.Ed.2d at 93. Hence, the Court held that the Fifth Amendment right to silence was waived and further determined that the use of pre-arrest

silence thereafter for impeachment advances the truth-seeking function of the trial.

Here, however, unlike the defendant in *Jenkins,* defendant did not testify. Further, based upon our review of the record, we conclude that the prosecution did not propose to use defendant's silence at trial only for impeachment. At the evidentiary hearing, the prosecution argued that defendant's willingness to answer biographical questions and failure to respond to questions about the shooting was probative of her mental state, indicated that at the time of the shooting she was aware of and appreciated the gravity of what she had done, and was good evidence that she knew right from wrong. The use of defendant's silence merely to impeach her statements to the mental health experts was not raised at the hearing or at trial.

Nor did the prosecution actually limit its use of the evidence to impeachment. The prosecution mentioned defendant's silence in the opening statement, examined six witnesses concerning it during its case-in-chief, and suggested during closing argument that such silence indicated defendant was sane at the time of the shooting and "she knew what happened."

For these reasons, we reject the argument that the prosecution used defendant's silence as impeachment evidence only.

### B.

The use of a defendant's pre-arrest silence as substantive evidence of guilt is significantly different from its use to impeach the defendant's credibility on the stand. *See Combs v. Coyle,* 205 F.3d 269, 281 (6th Cir. 2000). The federal circuits are divided on the admissibility of such evidence. Four circuits have concluded that it is inadmissible as substantive evidence of guilt in the prosecution's case-in-chief. *See Combs v. Coyle, supra; United States v. Burson,* 952 F.2d 1196 (10th Cir.1991); *Coppola v. Powell,* 878 F.2d 1562 (1st Cir.1989); *United States ex rel. Savory v. Lane,* 832 F.2d 1011 (7th Cir.1987). Three other circuits, however, have reached the opposite conclusion. *See United States v. Oplinger,* 150 F.3d 1061 (9th Cir.1998); *United States v. Zanabria,* 74 F.3d 590 (5th Cir.

1996); *United States v. Rivera*, 944 F.2d 1563 (11th Cir.1991).

Those circuits that have found the use of pre-arrest silence *inadmissible to prove guilt* when the defendant does not testify have recognized that the right to remain silent, unlike the right to counsel, attaches before the institution of formal adversary proceedings and is not limited to persons in custody or those charged with a crime. *See United States ex rel. Savory v. Lane, supra* 832 F.2d at 1017. In addition, the right to silence, which historically has been given a broad scope, may be asserted by a suspect who is questioned during the investigation of a crime or by any person in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory. *See Combs v. Coyle, supra; United States v. Burson, supra; cf. Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)(the viability of the privilege depends on whether a responsive answer to the question might result in a harmful disclosure).

In contrast, the three circuits that have reached the opposite conclusion base their decisions on the lack of governmental coercion or compulsion to speak in a pre-arrest setting. *See United States v. Oplinger, supra; United States v. Zanabria, supra, United States v. Rivera, supra.* They reason that, as Justice Stevens stated in his concurring opinion in *Jenkins v. Anderson, supra,* the privilege against compulsory self-incrimination is irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak. Justice Stevens opined that "in determining whether the privilege is applicable, the question is whether [the defendant] was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent." *Jenkins v. Anderson, supra,* 447 U.S. at 243–44, 100 S.Ct. at 2132, 65 L.Ed.2d at 98.

However, as Justice Marshall explained in his dissent in *Jenkins:*

[U]nder that view, a person's right not to incriminate himself exists only if the government has already attempted to compel him to do so. If no officials have tried to get the person to speak, he evidently has a duty to incriminate himself, because the reporting of a crime is a civic duty and the Fifth Amendment is not applicable since the decision to speak or remain silent is, at that time, "voluntary."

But the prohibition against compelled self-incrimination is another way of expressing the right not to incriminate oneself. After all, the only means of compelling a person to incriminate himself is to penalize him if he does not.

*Jenkins v. Anderson, supra,* 447 U.S. at 250 n. 4, 100 S.Ct. at 2135, 65 L.Ed.2d at 102 (Marshall, J., dissenting) (citations omitted).

We agree with the reasoning of the First, Fifth, Sixth, and Tenth Circuits and Justice Marshall that the Fifth Amendment right to be free from self-incrimination applies to pre-arrest silence. *See also State v. Rowland*, 234 Neb. 846, 452 N.W.2d 758 (1990); *State v. Easter*, 130 Wash.2d 228, 922 P.2d 1285 (1996); *cf. People v. Herr*, 868 P.2d 1121 (Colo.App.1993)(any comments by a prosecutor regarding a defendant's pre-arrest silence should be avoided). Permitting the use of silence in the prosecution's case-in-chief penalizes the exercise of the right against self-incrimination by commenting upon the failure to speak. *See Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)(Fifth Amendment forbids both comments by the prosecution on the accused's refusal to testify at trial and instructions by the court that such silence is evidence of guilt); *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)(Fifth Amendment guarantees the right of a person to remain silent, unless he or she chooses to speak in the unfettered exercise of his or her own will, and to suffer no penalty for such silence).

Allowing the substantive use of such silence would also substantially impair the policies behind the privilege: our society's unwillingness to subject those suspected of crime to the dilemma of self-accusation, perjury, or contempt; the preference for an accusatorial rather than an inquisitorial system of criminal justice; the fear that self-incriminating statements will be elicited by inhumane treatment and abuses; the sense of fair play which dictates a fair state-individ-

ual balance by requiring that the state shoulder the entire burden of proof; respect for the inviolability of the human personality and of the right to privacy; distrust of self-deprecatory statements; and the view that the privilege, while sometimes a shelter for the guilty, is often a protection for the innocent. *See Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), *overruled on other grounds by United States v. Balsys,* 524 U.S. 666, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998).

If pre-arrest silence were admissible for substantive purposes, a defendant could not avoid the introduction of past silence by refusing to testify. Thus, a defendant would be under pressure to waive the privilege against self-incrimination, either upon first contact with police or later at trial, to explain the prior silence. And, unlike its use for impeachment, use of silence in such an instance would lessen the prosecution's burden of proving each element of the crime. *See Combs v. Coyle, supra.*

In addition, unlike its use for impeachment, the use of pre-arrest silence as substantive evidence of guilt does not enhance the reliability of the criminal process of truth-seeking because it is ambiguous. *See Combs v. Coyle, supra,* 205 F.3d at 285 (there are many reasons why a defendant may remain silent before arrest, such as knowledge of *Miranda* rights or fear that his or her explanation may not be believed); *Cox v. People,* 735 P.2d 153 (Colo.1987)(silence in the ordinary sense means a forbearance from speech or standing mute on a particular matter and for this reason often may be inherently ambiguous).

Therefore, we conclude that the use of pre-arrest silence when the defendant does not testify impermissibly burdens the privilege guaranteed by the Fifth Amendment and thus is inadmissible in the prosecution's case-in-chief as substantive evidence of guilt or sanity. No evidentiary inference of consciousness of guilt or sanity can trump a Fifth Amendment right. *See Coppola v. Powell, supra.*

Here, the prosecution elicited information about defendant's silence and referred to it on numerous occasions. In its opening statement, the prosecution noted that defendant "doesn't say anything" in response to paramedics' questions about what had happened. It noted that, when defendant got to the hospital, the emergency room nurse asked her what had happened and she did not respond, but gave the nurse her name and told her whether she was allergic to medication.

The prosecutor then told the jury that a detective came to the hospital after the shooting to interview defendant. The prosecutor stated, "[T]he police didn't have a clue what happened in the apartment. They thought [defendant] was a victim. [The] detective ... asked [defendant] 'did anyone break in there?' There was no immediate response."

As its second witness at trial, the prosecution called one of the first officers at the scene. The officer stated that defendant had told him her name, the victim's name, and her age. He stated, "[W]henever I would ask any other questions regarding how did you get injured, how did the other person get injured, trying to get suspect information, she would not answer ... she would immediately clam up." The prosecutor then went over repeatedly in detail the questions that defendant did not answer.

The prosecution also called a firefighter who testified that defendant would not respond when other people asked her questions at the scene. It also called a police technician who testified that defendant answered questions concerning her occupation and her dominant arm, but did not respond to questions about what happened or whether she knew who had done this to her.

The prosecution also called the interviewing detective. He testified that defendant declined to answer whether someone had entered the apartment and shot her and that she did not respond to a question whether she had shot herself. The prosecutor asked the detective if it seemed to him that defendant could hear his questions. The detective responded, "I eventually asked her if she understood what I was asking her, and she responded to that question by saying she didn't want to make a statement at this time

because she might say something wrong." He also testified that defendant was different from other people he had interviewed who were later found insane, because "she is alert, understands what I am asking, but doesn't want to respond or refuse[s] to respond."

The prosecution also called two emergency room nurses, who testified that defendant would look away when asked what happened and would "seemingly choose not to tell" on several occasions. One nurse also noted that defendant did not respond to the emergency room physician's question concerning what had happened.

In its closing, the prosecution argued:

What is normal? What is the normal reaction for someone to answer [what happened]? You have no memory. You wake up. Someone you love, you see the one you love is dead. Are you going to remain silent when someone asks you what happened? Or do you shoot yourself in the chest? And someone ask[s] you what happened, are you going to remain silent?

Finally, in its rebuttal argument, the prosecution again mentioned defendant's silence, reminding the jury that the emergency room nurse had stated that defendant answered nearly every question except those about what had happened. The prosecutor then stated, "[I]nstead of saying I don't know or I don't remember, are you telling me what happened, she just turned her head. She knew what happened."

We conclude that this evidence and comment violated defendant's Fifth Amendment rights.

### C.

■ We reject the People's argument that this case is closely akin to *United States v. Davenport*, 929 F.2d 1169 (7th Cir.1991), and that its holding should be followed here.

In *Davenport*, two defendants gave a version of the events in an attempt to foreclose further investigation by the government, but then refused to answer questions about the details of that version of events. The court commented that the privilege against self-incrimination is not a privilege to attempt to gain an advantage in the criminal process by selective disclosure followed by an assertion of a right to remain silent. It held that, once the defendants started down the "self-exculpation road," they could not evade questions concerning their original version of events.

Here, however, defendant did not initially make a statement about what had happened and then later choose not to speak. Further, she did not try to exculpate herself with one version of events and then later give a different version.

Accordingly, we reject this argument in this factual setting. However, we do not express an opinion concerning the application of the *Davenport* rationale in other factual settings.

### D.

■ Errors in the admission of evidence, even of constitutional dimension, do not require reversal of a criminal conviction if the errors are harmless beyond a reasonable doubt. A constitutional harmless error analysis differs from a general harmless error analysis. Under a harmless error standard, reversal is required only if the error affects the substantial rights of the defendant. *See People v. Garcia*, 28 P.3d 340 (Colo.2001). Under a constitutional harmless error standard, reversal is required unless the court is confident beyond a reasonable doubt that the error did not contribute to the guilty verdict. *See Blecha v. People*, 962 P.2d 931 (Colo.1998).

■ The constitutional harmless error test is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. *Bernal v. People*, 44 P.3d 184 (Colo.2002).

■ To determine whether such an error is harmless, an appellate court must examine the facts of the case to determine whether the error affected its outcome. *Topping v. People*, 793 P.2d 1168 (Colo.1990). In making that determination, we consider the entire record, including the jury instructions and the evidence and arguments pre-

sented at trial. *See Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *People v. Harlan,* 8 P.3d 448 (Colo. 2000). We may consider the use to which the prosecution puts the evidence of silence, the party who elected to pursue the line of questioning, the quantum of other evidence of guilt, the intensity and frequency of the reference, and the trial court's opportunity to grant a motion for mistrial or to give curative instructions. *See United States v. Massey,* 687 F.2d 1348 (10th Cir.1982); *see also People v. Rivera,* 968 P.2d 1061 (Colo.App. 1997)(not every reference to a defendant's silence requires reversal; determining factors are whether the improper remarks were used by the prosecution as a means of creating an inference of guilt and whether the prosecution argued that defendant's silence constituted an implied admission of guilt).

Here, it was undisputed that defendant killed the victim. Thus, the primary issue at trial was defendant's sanity and culpable mental state.

Given the evidence cited above, we conclude that the admission of defendant's pre-arrest silence under the circumstances of this case cannot be considered harmless error. The prosecution's references to defendant's silence were not isolated, but were pervasive throughout the trial and were used to prove that defendant was sane, had the intent to kill, and acted after deliberation. And, although the trial lasted four weeks and there was independent evidence of defendant's pre-meditation and planning, the expert testimony as to defendant's mental state and sanity at the time of the shooting was contradictory. *Cf. Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986)(use of the accused's silence after receiving *Miranda* warnings as evidence of sanity violated due process principles); *People v. Galimanis,* 765 P.2d 644 (Colo.App.1988)(same). Thus, we cannot say with fair assurance that the prosecution's repeated references throughout the trial to defendant's silence did not influence the jury's verdict. *See People v. Rodgers,* 756 P.2d 980 (Colo.1988)(if there is a reasonable possibility that the defendant could have been prejudiced, the error cannot be harmless beyond a reasonable doubt). Conse-

quently, we must reverse defendant's conviction and remand for a new trial. *See People v. Cobb,* 962 P.2d 944 (Colo.1998)(when error is of constitutional dimension and not harmless beyond a reasonable doubt, defendant's conviction must be reversed).

In view of this determination, we need not address defendant's argument that the use of her pre-arrest silence violated her due process right to fundamental fairness or that such evidence was irrelevant under *People v. Quintana,* 665 P.2d 605 (Colo.1983).

## II.

■ Because it is likely to arise upon retrial, we next address defendant's contention that the trial court erred when it allowed the prosecution to impeach defendant's psychiatric expert with a written transcript of another judge's findings regarding the expert's credibility in a different case. We conclude that the introduction of this hearsay evidence violated defendant's right to confront the witnesses against her.

The hearsay evidence consisted of a judge's finding that the opinion of defendant's psychiatric expert in the sentencing phase of another case

> will receive no credibility whatsoever by this court. He came up with facts that are not facts. He created facts. He looked at everything in the light most favorable to the defendant. He was not an objective third party evaluator in court. His credibility with the court is very low.

When the prosecutor asked the expert witness if it was true that the court made those findings, the witness acknowledged the court's statement.

### A.

■ The right of criminal defendants to confront witnesses is guaranteed by the United States and Colorado constitutions. The right of confrontation generally requires that the prosecution present evidence through live testimony, giving the defendant the opportunity to cross-examine. The purposes of the right of confrontation are to prevent conviction by affidavit, to permit cross-examination as a tool for testing the

witness' statements and recollections, and to allow the jury to judge the demeanor of the witness and thereby better assess credibility. *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *People v. Dement,* 661 P.2d 675 (Colo.1983).

The Confrontation Clause and the hearsay rule and its exceptions protect similar, but not identical interests. Accordingly, the Confrontation Clause may be violated even though statements are admitted under a recognized exception to the hearsay rule. *California v. Green, supra; see also United States v. Oates,* 560 F.2d 45 (2d Cir.1977); *People v. Farrell,* 34 P.3d 401 (Colo.2001).

Otherwise admissible hearsay is generally subject to two requirements for admission under the Confrontation Clause. First, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use. After the prosecution proves unavailability, it must then demonstrate that the statement possesses particularized guarantees of trustworthiness. This second requirement may be met by a showing that the statement falls within a firmly rooted hearsay exception. *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Blecha v. People, supra.*

In federal constitutional jurisprudence, the requirement of unavailability is qualified. *See United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)(unavailability is not always required); *Ohio v. Roberts, supra.* However, the Colorado Supreme Court, while acknowledging the limitations placed on the two-step analysis in federal jurisprudence, has continued to apply both requirements pursuant to the Colorado Constitution. *Blecha v. People, supra; People v. Dement, supra; see also Bernal v. People, supra.*

The only exception to unavailability recognized in Colorado occurs when the utility of trial confrontation is remote, as when the hearsay evidence is not crucial to the case and is cumulative of other testimony that the defendant had an opportunity to cross-examine. *People v. Dement, supra.* We conclude that the hearsay evidence in this case was important to the prosecution's case and was not cumulative. Accordingly, the prosecution was required to meet the unavailability requirement.

Here, the prosecution failed to produce the declarant as a witness, nor did it demonstrate his unavailability. To the contrary, the prosecution stated on the record that the declarant was available to testify. Further, the trial court did not find that the declarant was unavailable. Accordingly, because the evidence was introduced through hearsay despite the fact that the declarant was available to testify, the admission of the evidence violated the confrontation clause of the Colorado Constitution, article II, § 16.

The People nevertheless argue that the failure to demonstrate unavailability is of no moment because defendant indicated that she might call the declarant as a witness. However, the burden of demonstrating unavailability is squarely on the prosecution, which must make a good faith effort to obtain the declarant's presence as a witness. *Ohio v. Roberts, supra; People v. Dement, supra.* The disadvantage suffered by a criminal defendant because of the prosecution's failure to call the declarant as a witness is not ameliorated by affording the defendant an opportunity to call that person. *United States v. Oates, supra.*

Our analysis is not altered by the fact that the hearsay evidence was not offered during the prosecution's case-in-chief, but rather to impeach a defense witness. No distinction is observed for Confrontation Clause purposes between substantive evidence and impeachment evidence. *See California v. Green, supra; Gaitan v. People,* 167 Colo. 395, 447 P.2d 1001 (1968).

Accordingly, the court erred in allowing the introduction of this evidence.

In the circumstances of this appeal, we do not reach the issue of the impropriety of calling a judge to testify as to his opinion of a witness' credibility in a prior case.

## III.

Defendant's final contention is that the trial court erred when it allowed certain

evidence that she argues was the product of a warrantless search and seizure of her car. Even assuming, without deciding, that the seizure was illegal, we nevertheless conclude that the evidence was properly admitted pursuant to the inevitable discovery exception to the exclusionary rule.

 While the exclusionary rule generally operates to suppress evidence that is unconstitutionally obtained, certain exceptions allow reception of the tainted evidence. These exceptions include inevitable discovery. *People v. Schoondermark*, 759 P.2d 715 (Colo.1988).

Under the inevitable discovery exception, evidence initially discovered in an unconstitutional manner may be received if it inevitably would have been obtained lawfully. In applying this exception, the court focuses on whether the evidence would have been discovered as a matter of course if independent investigations were allowed to proceed. The court must be convinced that the evidence *would* have been discovered, not that it might or could have been discovered. *People v. Burola*, 848 P.2d 958 (Colo.1993).

Here, information obtained independently both before and after the seizure of defendant's car revealed that the victim's wound was not consistent with suicide, and there was evidence that defendant had shot the victim and then moved the body. There were no signs of forced entry in the apartment. There was evidence that defendant's gunshot wounds were self-inflicted. The police also learned independently of the nature of the relationship between defendant and the victim, that the victim had attempted to end his relationship with defendant, and that defendant was distraught over the breakup. Defendant had refused to provide information about how the incident happened. In a search of the victim's apartment pursuant to a warrant, police had found the handgun used in the shooting and a note giving next-of-kin information for both defendant and the victim. The police were unable to locate defendant's car at the scene.

All of this information was obtained independently from the seizure of defendant's car, and much of it was recited in the application for a later warrant to search the car. We are convinced, therefore, that defendant's car would have been seized and searched and the evidence introduced at trial would have been found, even if an illegal seizure had never occurred, had the independent investigation been allowed to proceed. For that reason, we conclude that the trial court did not err in admitting the evidence discovered as a result of the search and seizure of defendant's car.

The judgment is reversed, and the case is remanded for a new trial consistent with the views expressed in this opinion.

Judge DAVIDSON and Judge NIETO concur.