**UNITED STATES ex rel. William ARGO, Petitioner,**

v.

**John PLATT, Respondent.**

**No. 87 C 4918.**

United States District Court,
N.D. Illinois, E.D.

Nov. 9, 1987.

Robert Agostinelli and Thomas A. Lilien, Office of State Appellate Defender, Ottawa, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen., and Kenneth A. Fedinets, Asst. Atty. Gen., State of Ill., Chicago, Ill., for respondent.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

William Argo ("Argo") has filed a petition for writ of habeas corpus (the "Petition") under 28 U.S.C. § 2254 ("Section 2254") against Joliet Youth Center Superintendent John Platt ("Platt").[1] As called for

1. Both the Petition (a 57–page magnum opus) and Argo's much more abbreviated (10–page) Response to the Answer to the Petition reflect first-rate presentations and analyses by Argo's pro bono counsel, the State Appellate Defender's Office, assisted by Northern Illinois University Law School student Kerry O'Brien. In contrast, the Attorney General's Office filed a brief An-

in Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts,[2] Platt has answered the Petition and filed a transcript of the state trial court proceedings.[3]

Argo challenges his July 27, 1984 murder conviction, asserting statements he made to the Bolingbrook Police Department on November 17 and 21, 1983 should have been suppressed as involuntary confessions and, moreover, were admitted at trial in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Argo also challenges an evidentiary ruling by the trial judge that kept a piece of allegedly exculpatory evidence from the jury. For the reasons stated in this memorandum opinion and order:

    1. Argo's contentions are rejected to a limited extent.

    2. In principal part, the resolution of Argo's claims must await an evidentiary hearing.

### Facts

Argo's conviction of having murdered ten-year-old Donald Green ("Green") rested almost entirely on (1) the self-inculpatory statements challenged by the Petition and (2) the direct fruits of those statements. Because the question of voluntariness of the statements is so fact-intensive, all the remaining paragraphs of this "Facts" section will reproduce the factual statement by the Illinois Appellate Court in the course of affirming Argo's conviction (though it reversed, on technical grounds, two other murder counts stemming from the same incident), reported at 133 Ill.App. 3d 421, 88 Ill.Dec. 382, 478 N.E.2d 873 (3d Dist.1985). To the extent more detailed facts are called for, they will be dealt with

in the course of this opinion's legal discussion.

"At 4:58 p.m. on February 26, 1983, the Bolingbrook police department received an anonymous call from a male who reported that he had seen the body of a boy in the creek by Kildeer Apartments. A search of the area was unsuccessful. The police were informed by Mrs. Julia Knowles that her 10-year-old son, Donald Green, had not returned home that evening. The next afternoon, Green's unclothed body was found face down in Lily Cache Creek. Green's clothing was found scattered on the bank nearby. An autopsy revealed a single stab wound to the left chest which penetrated the heart. There was an abrasion on the right scapular area. There were scratches on the buttocks and feces near the anus.

"The Bolingbrook police began an intensive investigation. Questioning of young boys in the area turned up the name of John Schwake ['Schwake'] as a reputed local child molester. One of Schwake's acquaintances among area boys was said to be defendant, Billy Argo. As of March 11, Schwake had not been questioned by the police.

"On March 11, Officers Ranum ['Ranum'] and Steinke ['Steinke'] went to Argo's mother, Mrs. Robbie Kanizar ['Kanizar'], and received permission to bring Argo to the station for questioning. The officers sought information on Schwake and others who frequented the area by the creek. Argo, 14 years old at the time, stated that he knew Schwake and that Schwake had once made a sexual advance to him. As the conversation continued, Argo became increasingly agitated and experienced difficulty in speaking. As the officers were about to leave to give Argo time to regain

---

swer (8 pages) and an even more brief Reply (5 pages), each of which traveled only a fraction of the route required to traverse the difficult and troublesome issues posed by this case. Because this opinion defers resolution of many of those issues, it necessarily does not discuss a substantial portion of the work forced to be done by this Court and its law clerk as the result of the skeletal responses to the Petition.

**2.** All further citations to those Rules will simply take the form "Rule—."

**3.** That transcript comprises five volumes containing the common law record, the Circuit Court trial transcript and the transcript of the Circuit Court transfer hearing. Because the transcript volumes have been misnumbered, all citations to the record will be to the pertinent page numbers ("R.—" for pretrial and hearing transcripts and "C.—" for the common law record).

his composure, Argo grabbed Ranum's hand and said something was bothering him. Argo eventually admitted to being present when Schwake molested and murdered Green. He then went to the bathroom and vomited.

"When Argo returned to the interview room, he was read his *Miranda* rights from a preprinted form. He signed the form and initialed each line, indicating his understanding of his rights. Mr. and Mrs. Kanizar were asked to come down to the station. As Billy became calmer he gave a statement containing facts which only someone present at the scene of the crime could have known. Ranum and Steinke related the substance of Argo's statements to the Kanizars.

"Investigators Wilkerson ['Wilkerson'] and Andalina ['Andalina'] were called in to interview Argo. Food and drink was offered. Argo indicated he was relieved that he had gotten the story off his chest. Despite the late hour, he remained responsive and alert. Mrs. Kanizar was brought in to hear the story and was told that her son was to be a witness and that she would be informed if charges were to be filed. Argo then gave a tape-recorded statement.

"Argo's statement accused Schwake of the molestation and murder of Green with no assistance on his part. Schwake supposedly ordered Green, at knifepoint, to remove his clothing 'or else.' Green resisted. Green undressed with Schwake's assistance. After forcing Green to perform oral sex on him, Schwake rolled Green over and sodomized him. When he had finished, Schwake rolled Green back over and got back on top of him. Green continued arguing with Schwake. As Argo walked away, he looked back to see Schwake stab Green in the chest. Schwake threw the body in the creek and washed off the knife. Once Argo completed the taped statement he returned home.

"On March 15, Andalina and Wilkerson went to the Kanizar residence and received permission to take Argo to the scene of the crime for a reenactment. Steinke and Ranum met the others at the scene. As they walked along the creek, Argo told the officers that Schwake had asked Argo if they 'wanted to have some fun with the kid.' Argo interpreted this to have sexual implications and answered in the negative. After reenacting the crime, Argo became quiet and reflective. Wilkerson asked him if something was bothering him. Argo responded that when Schwake rolled Green back over after sodomizing him, he told Argo to come over and have Green suck him. Schwake did not threaten Argo, but Argo felt that he should comply. After a minute, Argo got up to urinate in the creek. Argo further informed the officers that after the stabbing of Green, he assisted Schwake in throwing the body into the creek.

"After making these admissions, Argo was taken to lunch by the officers. They then brought him to the Will County State's Attorney's office, where Argo repeated his revised story to Chief Felony Assistant Burmila [actually Burmilla, 'Burmilla'] and again to State's Attorney Petka. Argo told them that his story was the truth and that he was willing to testify in court. As of March 15, all concerned considered Argo a witness in the pending case against Schwake. In August and September Argo was brought to the State's Attorney's office to prepare his testimony.

"Sometime prior to November 17, an important witness against Schwake recanted her incriminating story and provided Schwake with a strong alibi. The authorities were skeptical of the veracity of this new evidence. Wilkerson thus sought and received permission to take Argo out of school to undergo a polygraph to confirm the truth of his accusations.

"Argo was taken to the Department of Law Enforcement in Joliet. The procedure began with the polygrapher, Dennis Luporini ['Luporini'] speaking with Wilkerson to learn the details of the case. Luporini then spoke with Argo alone for a while as a pretest interview. After some control tests, Luporini questioned Argo for real. At no time prior to or during the test was Argo informed of his constitutional rights. Wilkerson testified that Argo was not under arrest and was free to go at all times.

"Luporini told Wilkerson that some of Argo's answers indicated deception. Wilkerson then went to Argo and indicated that some portions of his story did not appear to be correct. Argo then added new details. When Schwake asked him if he wanted to have fun with Green, Argo responded 'maybe,' as opposed to 'no.' He also aided Schwake in removing Green's clothing. As Schwake molested Green, Argo became excited and decided to participate in the sexual activity without prompting from Schwake. Finally, Argo admitted to preventing Green from fleeing and telling on them. It was while Argo was holding Green that Schwake stabbed him. Wilkerson indicated that he'd like to take another polygraph to verify Argo's revised story, but Luporini doubted an accurate reading could be taken given Argo's frame of mind. Wilkerson took Argo home and informed his mother that Argo had not been entirely truthful. He received permission to take Billy out of school the following Monday, November 21, for another polygraph. At some point between the two polygraphs, Wilkerson informed the State's Attorney's office of Argo's additional admissions.

"On November 21, Andalina and Wilkerson picked Argo up at school and took him to Joliet. They arrived at 1:30 p.m. Between that time and 4 p.m., Luporini interviewed and polygraphed him. No *Miranda* warnings were given. After Luporini told Argo that his new polygraph indicated deception, Argo admitted to the stabbing of Donald Green. The officers were called in. At that point, the officers considered Argo not free to leave. He was read his rights from a card and agreed to talk.

"His first version of the occurrence had Argo and Schwake's roles transposed from his original account. Wilkerson expressed disbelief, since the police had information that Schwake was not at the scene. Argo then claimed sole responsibility for the crime. Wilkerson observed that the evidence suggested a struggle involving more than two people. Argo then indicated that his companion was Scott Maxwell, a boy who used to live near him. Wilkerson told Argo that Maxwell had already been interviewed and was not near the scene at the time. After some encouragement from Wilkerson, Argo broke down and admitted that his accomplice had been his stepbrother. The two had made a pact that if one were caught he would not tell on the other.

"This interview lasted until 9 p.m. Argo was allowed to use the bathroom and to get something to drink. The investigators then took a taped statement. The statement began with Argo's acknowledging that he had been read his rights, understood them and had agreed to talk, with no threats or promises being made. To make a long story short, Argo thoroughly incriminated himself as the protagonist of the molestation and murder of Green. He was arrested immediately. The [murder] charges against Schwake were dropped."

### Pretrial, Trial and Appellate Proceedings

Because of Argo's youth (age 14 at the time of the offense, 16 at the time of trial), the initial determination to be made was whether he should be tried in Juvenile Court as a delinquent or as an adult pursuant to the Juvenile Court Act, Ill.Rev.Stat. ch. 37, ¶ 702–7. After an extensive hearing, the court ruled Argo was to be tried as an adult.

Next Argo moved to suppress his November 17 and 21, 1983 statements (given when he was still 15 years old) to polygraph examiner Luporini and to Detectives Wilkerson and Andalina (collectively "Detectives").[4] Argo claimed the statements should be suppressed as involuntary and also because those made before 4 p.m. No-

4. Argo also moved to suppress his pocket knife seized by the police as a direct result of his November 21 statement, when he (1) said the knife he'd used in the attack was in his dresser drawer at his home, (2) drew a diagram of the knife and its location and (3) gave written consent to the police's procuring it that evening (R. 222–26). Argo's counsel correctly characterize the knife as derived solely from the inculpatory statements ("fruit of the poisonous tree," *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)), so its admissibility stands or falls on the admissibility of the November 21 statement. Accordingly this opinion will not separately discuss the suppression of the knife.

vember 21 were obtained without advising Argo of his *Miranda* rights. During the suppression hearing extensive testimony was provided by Ranum, Andalina, Burmilla, Luporini, Wilkerson Steinke, Assistant State's Attorney Philip Mock and Kanizar (R. 16–308).

After the hearing the trial court denied the motion to suppress, explaining briefly that Argo was not "in custody" when the statements were made, so as to activate *Miranda*'s protections (R. 347). However, the court's only reference to Argo's voluntariness claim was an oblique one—a comment that Argo's November 21 admission "was a surprise statement made by him that took everyone by surprise" (*id.*).

During the trial the prosecutor made an oral motion in limine (R. 697–98) to exclude from evidence a traffic citation received by Schwake the day of Green's murder. Exclusion was sought on the grounds the citation was irrelevant and lacked the proper foundation. Argo's counsel responded that Schwake had altered the time the citation had been issued by an officer of the Elk Grove Village Police Department, in an effort to create an alibi for the time of the murder. Argo claimed the alteration helped to establish Schwake's involvement in the actual murder (R. 698–706). Without any elaboration, the trial court simply granted the motion to exclude the citation (R. 706).

After several hours of deliberation, the jury found Argo guilty of three counts of murder. Argo was sentenced to three concurrent terms of 30 years' imprisonment (R. 946–48). On appeal only the Count I conviction and the sentence were sustained,[5] the Appellate Court holding (1)

Argo had not been in custody for *Miranda* purposes when the unwarned statements were made (133 Ill.App. at 428, 88 Ill.Dec. at 388, 478 N.E.2d at 879), (2) all his November 17 and 21 statements were voluntary (*id.* at 429, 88 Ill.Dec. at 388, 478 N.E.2d at 879) and (3) the exclusion of the traffic citation, if error at all, was harmless (*id.* at 430, 88 Ill.Dec. at 389, 478 N.E.2d at 880).[6] On October 2, 1985 Argo's petition for leave to appeal was denied by the Illinois Supreme Court.

### Theories and Standards

Though the Petition is framed in terms of two grounds for habeas relief (improper admission of Argo's November statements and improper exclusion of Schwake's traffic citation), the first of those really poses three constitutional questions. This opinion therefore addresses the issues in four sections:

1. Argo's Fifth and Fourteenth Amendment[7] right to be free from compelled self-incrimination was assertedly violated by the admission of his November 17 and his pre–4 p.m. November 21 statements, all obtained without advising him of his rights under *Miranda* (the "*Miranda* Violation Claim").

2. Argo's Fifth and Fourteenth Amendment rights were assertedly violated by the admission of all his involuntary confessions (the "Involuntary Confessions Claim").

3. Argo's Fifth and Fourteenth Amendment rights were assertedly violated by the admission of his post–4 p.m. November 21 statement without a *valid* waiver of his *Miranda* rights (the "Invalid Waiver Claim").[8]

---

5. Because the Appellate Court (with the State's concurrence) reversed the conviction on two counts but upheld the 30–year sentence anyway (an issue not raised by Argo here), this opinion need not deal with the trial court's sleight-of-hand by which a single act producing a single death could sustain a guilty judgment on three counts of murder.

6. Other issues raised in Argo's appeal and rejected by the Appellate Court have not been renewed here and need not be considered.

7. In accordance with by-now universal judicial usage (because it is convenient, even though conceptually inaccurate), this opinion will refer directly to the Bill of Rights provisions deemed incorporated by the Fourteenth Amendment, rather than to that Amendment itself (the sole source of constitutional safeguards against state action).

8. This claim—that Argo's waiver of *Miranda* rights was invalid because involuntary and not "knowing and intelligent"—was raised only briefly in his original Petition here (Pet. 50–52) and with somewhat more emphasis at pages 3–4

4. Argo's due process right to present a defense was assertedly violated by the trial court's exclusion of exculpatory evidence (the "Excluded Evidence Claim").

All four contentions must be examined in light of the controlling principles recently restated in *Cole v. Young*, 817 F.2d 412, 416 (7th Cir.1987) (citations omitted):

> The only basis for granting federal habeas relief is a violation of federal statutory or constitutional law.... "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."

One other facet of the limited federal role in state criminal proceedings must also be kept in mind throughout: the Section 2254(d) mandate that factual findings of state courts get a presumption of correctness. That presumption may have a varying effect on Argo's claims. On the Involuntary Confessions Claim a federal court must determine voluntariness independently, despite the state courts' prior determinations on that score (*Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985)). At the same time, factual issues subsidiary to the legal conclusion of voluntariness do merit the Section 2254(d) presumption (*id.*). *Miller* also teaches "the federal habeas court should, of course, give great weight to the considered conclusions of a coequal state judiciary" (*id.*). On the other hand, as to the state court finding that Argo was not in custody for *Miranda* purposes before he admitted he stabbed Green, it is not wholly clear whether that determination comes under the Section 2254(d)(8) rule that it will not be overturned unless "not fairly supported by the record." As the later discussion reflects, however, it turns out to make no difference either way.

### Miranda Violation Claim

■ Argo contends his November 17 and pre–4 p.m. November 21 statements to Luporini and Wilkerson should have been suppressed because Argo had not then been advised of his rights under *Miranda*. Argo was concededly not given *Miranda* warnings between his initial March 11–12 questioning (when they were given) and 4 p.m. November 21 (R. 239, 247). Platt Ans. 3 responds that *Miranda* warnings are not required until a defendant is in custody, and Argo was not in custody before he admitted stabbing Green.[9]

In the now-famous passage from *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, "custodial interrogation" (the operative event for preinterrogation warning) was defined as occurring when "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Since 1966 the Court (like the lower federal courts) has wrestled with the innumerable factual situations to which the label "custody" might be applied. More recently *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)) has put the question in terms of "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." Accord, such cases as *United States v. Bush*, 820 F.2d 858, 861 (7th Cir.1987). Each

---

of his Response to Platt's Answer. This aspect of his overall Fifth Amendment claim was not raised either by his motion to suppress or at trial, and was raised only in passing in his Brief 59–60 to the Appellate Court. Not surprisingly the Appellate Court did not address the issue in its opinion. Though that set of facts might normally disqualify the issue from consideration here on waiver grounds, Platt has not urged Argo's possible waiver. Because waiver may not be raised sua sponte by a district court (*Barrera v. Young*, 794 F.2d 1264, 1269 (7th Cir.1986)), this opinion will reach the merits of the claim.

9. In a way Platt's correct emphasis on the custodial-holding watershed for *Miranda* warnings is inconsistent with the officers' reading of Argo's rights to him once he admitted the killing—certainly nothing was specifically said or done to Argo at that point to suggest he was no longer free to leave, while he had been previously. But the officers may then have *felt* that way and therefore proceeded with the warnings. This opinion need not pause on the question whether the objective facts, as reasonably viewed by the person being interrogated, or the subjective viewpoint of the interrogator should trigger the *Miranda* obligation.

case's facts are to be evaluated by "how a reasonable man in the suspect's position would have understood his situation"—and not on "a policeman's unarticulated plan" to take the suspect into custody (*Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)).

"Custody" might arguably be viewed either as a fact issue (in which event the state courts' decision of "no custody" as to Argo before 4 p.m. November 21 arrives at this Court with a presumption of correctness) [10] or as a mixed-law-and-fact issue (in which event the *Miller v. Fenton* mandate of independent federal determination must operate). Here the situation is complicated by the Illinois Appellate Court's having decided the question under an arguably incorrect legal standard: "whether a reasonable person, *innocent of the charges,* would have felt deprived of his freedom of action in any significant way" (133 Ill.App. at 427, 88 Ill.Dec. 387, 478 N.E.2d at 878) (emphasis added). Adding that emphasized factor —one unsupported by any Supreme Court or Seventh Circuit case [11]—could impermissibly enhance a defendant's burden.

Under the circumstances this Court will apply the unadorned *Berkemer* "reasonable man" standard (468 U.S. at 442, 104 S.Ct. at 3151) independently. Scrutiny in those terms leads to the conclusion that Argo was *not* in custody at the pertinent time. And the same conclusion would of course follow a fortiori if either the "innocent-of-the-charges" test or the presumption-of-correctness test, or both, was or were factored into the analysis.

There is no real contest as to the facts here. Argo was brought by Wilkerson to the Illinois Department of Law Enforcement for the polygraph examination on both days. In each instance he went voluntarily and was never told by Detectives he was under arrest or not free to leave. Each examination took place in a closed room with Luporini. On occasion Wilkerson and Andalina would join them or would question Argo alone. Argo was allowed to use the bathroom (though safety regulations occasioned by a nearby ballistics laboratory led to his being escorted by an officer), and he was given something to drink. No threats were made that Argo had to submit to the test or speak with Detectives before being allowed to leave. All these findings are fully and fairly supported by the record.

Argo had a long history of association with Detectives by the time of the November statements. Since March 1983 he had been cast as the State's main witness in the then-expected Schwake prosecution. Argo's counsel has emphasized (albeit for a quite different purpose) that on several occasions he'd admitted to serious felonies and each time had been allowed to leave after the interview (Pet. 38–39). True enough, Argo's having been allowed to return home *after* the questioning (for example on November 17) is not dispositive of whether he was in custody *during* the questioning (see *United States v. Brown,* 531 F.Supp. 37, 41 (D.Mont.1981), where the court held that to rule no "custody" existed just because the suspect was allowed to leave after questioning would render *Miranda* protections hollow if he could then be arrested at a later date based on his pre-release statements). But the real thrust of the extensive prior interviews in

10. *United States v. Beraun-Panez,* 812 F.2d 578, 580 (9th Cir.1987) held a district court's finding of custody was "essentially factual" and would be reviewed under a "clearly erroneous" standard. Though *Beraun-Panez* involved the direct review of a federal criminal prosecution, its logic is applicable to a district court's role in habeas review. As *United States v. Hawkins,* 823 F.2d 1020, 1023 n. 1 (7th Cir.1987) recently said in dealing with a waiver of *Miranda* rights, the standard of review should be the same in direct review and habeas cases. Application of Section 2254(d) to the custody issue is also suggested by our Court of Appeals' recent treatment of the voluntariness of a *Miranda* waiver as a factual determination entitled to the presumption of correctness (*Bryan v. Warden, Indiana State Reformatory,* 820 F.2d 217, 219 (7th Cir.), cert. denied, —— U.S. ——, 108 S.Ct. 190, 98 L.Ed.2d 142 (1987)).

11. On occasion the Ninth Circuit has added the same "innocence" variation to its phrasing of the test for custody (see *United States v. Wauneka,* 770 F.2d 1434, 1438 (9th Cir.1985)). That seems problematic, given the applicability of Fifth Amendment privileges to the putatively guilty as well as to the innocent.

the *Miranda* context is that Argo, having been permitted to leave all the previous times he'd made incriminating statements, would not reasonably have perceived himself to be in custody on November 17 or 21.

Argo Pet. 37 maintains the interrogation became custodial November 17 at the moment Luporini challenged Argo's veracity. But the record does not indicate any objective changes took place at that point. There were no new indicia that Argo's freedom of movement had in any way been restricted. It is black-letter law that not all police interviews are custodial, even when the interview or questioning takes place at a police station (see, e.g., *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714). Whether police have probable cause to arrest a defendant, or whether a defendant is a suspect in the investigation, is not the issue. Argo's arguments to that effect miss the mark. What this Court must consider is how Argo reasonably perceived his situation at that point.

Here one of the major theme's of Argo's Petition must be first addressed. Argo urges that his youth and other individualized factors must be taken into account when considering the impact of the interrogation on him. Throughout its consideration of all aspects of the Petition, this Court has been keenly aware of Argo's youth and of the "special care" necessary to protect the rights of juveniles in criminal proceedings (see, e.g., *Haley v. State of Ohio*, 332 U.S. 596, 599–601, 68 S.Ct. 302, 303–304, 92 L.Ed. 224 (1948)). It is also aware that since the Supreme Court's more recent pronouncement that *custody* is an objective inquiry—calling for the understanding of "a reasonable man in the suspect's position" (*Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151)—the Court has had no occasion to determine whether the "sus-

pect's position" embraces his or her individual characteristics (such as youth) or merely the objective outside conditions to which he or she is subjected.

Although the former of those alternatives (within limits) seems more logical,[12] that is another issue this opinion is not called upon to resolve. Even with full allowance for Argo's personal characteristics, the facts of the November 17 and 21 sessions do not support a finding of custody. No objective factors would have led even a youth of Argo's limited experience and intelligence to conclude his freedom of movement had been restrained. Even though the Appellate Court's finding that no such restraint was evidenced in the record might have been tainted by the standard that court applied, this Court's own independent review of the record has compelled the same conclusion. Argo's submissions to this Court have adduced no facts to the contrary.

Because Argo was certainly not in custody before he admitted stabbing Green,[13] no *Miranda* warnings were required. Argo's Fifth Amendment rights were not violated by omission of the warnings before they were actually given November 21.

### Involuntary Confessions Claim

■ Independently of his "*Miranda* Violation Claim," Argo contends all his November statements—both before and after the November 21 warnings—should have been suppressed as "involuntary" in the legal sense. Argo stresses his tender age, his low level of intelligence, his relative inexperience with the police, the lack of *Miranda* warnings at the outset and the duration of the interrogation, all as assertedly leading to the conclusion his statements were not the product of his free and rational choice. He also emphasizes the

---

12. At least one post-*Berkemer* decision has held such individual characteristics—to the extent police officers are charged with knowledge of those factors—are relevant to a determination whether a suspect would have perceived himself or herself to be in custody (*Beraun-Panez*, 812 F.2d at 580–81). That "refined objective" approach (*id.* at 581) might also be drawn from another area of law: In tort law childrens' actions are not judged by the standards of reason-

able adults but of children "of like age, intelligence and experience" (Prosser and Keeton, *Law of Torts* 179 (5th ed. 1984)).

13. Once again, the question of custody vel non *after* he made that admission was rendered moot by the fact *Miranda* warnings were then given Argo.

coercive use and impact of the two polygraph examinations and his apparent belief that the police had implicitly promised not to prosecute him for his involvement. In response, Platt maintains the totality of the circumstances indicates Argo fully and voluntarily chose to confess his guilt. Platt also urges that in light of *Colorado v. Connelly*, —— U.S. ——, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) Argo's personal characteristics cannot be considered because there was no coercive activity by the police.

If Argo's confession was indeed involuntary, that would mandate habeas relief (see *Spano v. New York*, 360 U.S. 315, 324, 79 S.Ct. 1202, 1207–08, 3 L.Ed.2d 1265 (1959)). *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (citation omitted) defines "the test of voluntariness" this way:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

In the *Culombe*-dictated process of "determining whether [Argo's] will was overborne" (*Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed. 2d 854 (1973)) this Court must assess (*id.*, citations omitted):

> the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, ...; his lack of education, ...; or his low intelligence, ...; the lack of any advice to the accused of his constitutional rights, ...; the length of detention, ...; the repeated and prolonged nature of the questioning, ...; and the use of physical punishments such as the deprivation of food and sleep....

As stated earlier, the Illinois Appellate Court's conclusion that Argo's confession was voluntary is not binding on this Court (*Miller*, 106 S.Ct. at 451). To the extent the Appellate Court's statements on the subject (133 Ill.App.3d at 429, 88 Ill.Dec. at 388, 478 N.E.2d at 879) may be characterized as subsidiary factual findings, however, they are entitled to the Section 2254 presumption of correctness (*Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982) (per curiam)).

Like the Illinois Appellate Court, this Court perceives the voluntariness issue—from the paper record alone—as a close and difficult question. In the era of the rack and the thumbscrew, the *Culombe* inquiry as to whether the "will has been overborne" was an easy one. But where as here mental pressures are involved, the decision whether the external or the internal compulsions operating on Argo triggered his confession can border on the metaphysical.

In this instance the trial judge, who had the opportunity to observe and evaluate the witnesses, did not address the voluntariness issue directly. On review the Appellate Court was necessarily limited to a reading of the transcript. But habeas procedure allows this Court to resolve factual issues on the basis of live testimony (Rule 8). Here that alternative is singularly appropriate, and an evidentiary hearing is therefore ordered on the Involuntary Confessions Claim.[14]

### Invalid Waiver Claim

Argo offers an alternative ground for suppressing his November 21 post-*Miranda*-warning statements to Detectives. His Pet. 50–51 contends his *Miranda* rights waiver was invalid and should be disallowed.

Normally a state court finding in that respect merits a presumption of correctness in the habeas court (*Bryan*, 820 F.2d at 219). But in this case, the Appellate Court, although the waiver issue was tendered to it at Argo Br. 60, failed to address

---

14. Under these circumstances, this opinion will not deal with the several legal questions this Court was prepared to discuss. Any such discussion would be not only premature but perhaps a merely advisory opinion (forbidden to federal judges).

the question in its decision. This Court must then reach its own conclusion on whether Argo knowingly and intelligently waived his rights under *Miranda*, albeit with deference to any subsidiary factual determinations by the Appellate Court.

For that purpose, the issue is whether Argo knowingly, intelligently and voluntarily waived his rights under the totality of the circumstances. Where as here a minor is involved, *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979) teaches:

> This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and [inquiry] into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

Clearly that analysis is closely linked to the voluntariness inquiry discussed in the preceding section. This Court will therefore order a Rule 8 evidentiary hearing on the Invalid Waiver Claim as well.

### Excluded Evidence Claim

Argo's final argument (Pet. 54–55) is that his constitutional right to present a defense was violated by the in limine exclusion of Schwake's altered traffic citation. Platt Ans. 7–8 counters by asserting the evidence was properly excluded as not sufficiently material, in effect contending exclusion of the evidence was harmless to Argo.

Once again the handling by the trial court left something to be desired: It simply granted the motion without explanation (R. 706). On appeal the Appellate Court found the probative value of the evidence to be limited and its exclusion to be harmless error (133 Ill.App. at 430, 88 Ill.Dec. at 387, 478 N.E.2d at 880).

Erroneous exclusion of evidence in a state court trial can on occasion rise to the level of constitutional error to justify habeas relief. What must be involved is the deprivation of a defendant's right to put forth evidence to establish a defense—"a fundamental element of due process of law" (*Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967)). Of course not every erroneous evidentiary ruling compels the granting of the writ. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), dealing with a state prosecutor's comment on defendants' failure to testify, placed the burden on the state to show that error was harmless beyond a reasonable doubt. And just last week our Court of Appeals confirmed in *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1016–17 (7th Cir.1987):

> Errors of constitutional magnitude are grounds for reversal unless they are "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also, e.g., United States ex rel. Miller v. Greer*, 789 F.2d 438 (7th Cir.1986) (en banc), *rev'd on other grounds*, —— U.S. ——, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); *see also United States ex rel. Allen v. Franzen*, 659 F.2d 745, 748 (7th Cir.1981). While the state suggests that perhaps some other standard is appropriate to habeas corpus actions, the law in this circuit is plainly otherwise. Although the Supreme Court was presented with an opportunity to resolve this issue in *Miller*, it found it unnecessary to reach the issue, holding instead that there had been no constitutional violation at all. —— U.S. at —— n. 6, 107 S.Ct. at 3108 n. 6; *cf. Id.* at —— - ——, 107 S.Ct. at 3110–11 (Stevens, J., concurring) (advocating less demanding standard for collateral review). Accordingly, the "harmless beyond a reasonable doubt" standard remains the law in this circuit, even where the errors are challenged on collateral review.

As the ensuing discussion suggests, this Court can leave to the future the question whether the exclusion of the disputed evidence here rises to the level of an "[e]rror[ ] of constitutional magnitude." As *Savory, id.* at 1018 (emphasis in original, citations omitted) says:

> Application of the presumption of correctness to the conclusion that the errors were harmless would be error. At the

risk of stating the obvious, we note that whether a constitutional error is harmless is not only a federal question, but one of federal *law*, and not of fact. We have held repeatedly that "mixed" questions of law and fact are subject to independent federal review, unaffected by the § 2254(d) presumption.... While the law/fact dichotomy is far from self-explanatory, we believe that questions, such as harmless error, that are *always* determined by the court fall safely on the "law" side of the line.

In this case Argo's principal theory of defense was that Schwake was in fact Green's murderer. On that theory the asserted value of the altered traffic citation was that it "constituted an admission which demonstrated a consciousness of guilt" (Argo Response-to-Answer 9) on Schwake's part. Schwake had received the written traffic warning in Elk Grove Village (some distance from the murder scene) at 11:15 a.m. on the day of the murder (R. 702–03). Two days after Schwake was arrested (some two weeks after the murder) the citation was seized by Wilkerson in a search of Schwake's residence (R. 763). When seized, the citation had been altered (shown by comparison to the original in the possession of the Elk Grove police) to show it had been written at 19:15 hours (7:15 p.m.) (R. 703), closer to the time Green was killed. Argo contended Schwake had tried to set up an alibi for the time of the murder (R. 704), thus leading to an inference of his involvement.

On the mistaken assumption that the alteration had taken place *after* Schwake was accused of the murder, the Appellate Court viewed the probative value of this evidence as limited (133 Ill.App. at 430, 88 Ill.Dec. at 389, 478 N.E.2d at 880):

> [T]he alteration is susceptible to a competing inference that Schwake, falsely accused of a capital crime but without unshakeable alibi, took steps to remedy this situation.

Argo Pet. 57 points out Schwake did not have a chance to alter the ticket after he was accused: He was accused and arrested March 12, 1983, and the ticket remained at his home until retrieved by Wilkerson March 14.

Its factual error led the Appellate Court to the erroneous conclusion that "both prosecution and defense could reasonably argue that this piece of circumstantial evidence supported its theory of the case" (133 Ill.App.3d at 430, 478 N.E.2d at 880). But most importantly for current purposes, that premise led in turn to a characterization of the assumed erroneous exclusionary ruling as harmless "in light of the overwhelming evidence against defendant stemming from his confession."

This opinion's earlier rulings have removed the underpinning from that final conclusion. Because the disputed ruling must be looked at in an evidentiary matrix that is not yet fixed (for it is dependent on the outcome of this Court's Rule 8 hearing), decision on the Excluded Evidence Claim must be deferred.

### Conclusion

Argo's *Miranda* Violation Claim is rejected as inadequate in law. All his other contentions must await disposition until this Court conducts a Rule 8 evidentiary hearing. This action is set for a status hearing November 16, 1987 at 9 a.m. to discuss establishing the arrangements for that hearing.