UNITED STATES of America ex rel.
William ARGO, Petitioner,

v.

John PLATT, Respondent.

No. 87C 4918.

United States District Court,
N.D. Illinois, E.D.

May 16, 1988.

Thomas A. Lilien, Asst. Defender, Office of State Appellate Defender, Ottawa, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen., Kenneth A. Fedinets, Asst. Atty. Gen., Chicago, Ill., for respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

William Argo ("Argo") has filed a petition for writ of habeas corpus (the "Petition") under 28 U.S.C. § 2254 ("Section 2254") against Joliet Youth Center Superintendent John Platt. This Court's November 9, 1987 memorandum opinion and order (the "Opinion," 673 F.Supp. 282):

 1. rejected one of Argo's claims (that based on an alleged violation of his *Miranda* rights) and

 2. held all others required an evidentiary ruling under Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts.[1]

That hearing has since taken place,[2] and this Court has reviewed both the testimony and the proffered exhibits, including listening to the tape recording of Argo's November 21, 1983 statement to the Bolingbrook police (R.Ex. 6). Both sides have tendered proposed findings of fact ("Findings") and conclusions of law ("Conclusions"), and the following Findings and Conclusions conform to this Court's obligations under Fed. R.Civ.P. 52(a).[3]

### Findings of Fact

 1. Throughout the period from mid-

---

1. All further citations to those Rules will simply take the form "Rule—."

2. On Argo's behalf his counsel called as witnesses Argo himself and his mother, Robbye Kanizar ("Kanizar"). Respondent's witnesses were Bolingbrook interrogating officers Detectives Robert Wilkerson ("Wilkerson") and Joseph Andalina ("Andalina") and Illinois Department of

Law Enforcement polygraph examiner Dennis Luporini ("Luporini").

3. To the extent (if any) the following Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the extent (if any) matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings.

March to mid-November 1983 [4] Argo was considered by all law enforcement authorities involved in the matter to be a witness in the pending case against John Schwake ("Schwake") for the sex-related murder of 10–year-old Donald Green ("Green") on February 26 (see Opinion, 673 F.Supp. at 284). At that point the situation changed (*id.*):

> Sometime prior to November 17, an important witness against Schwake recanted her incriminating story and provided Schwake with a strong alibi. The authorities were skeptical of the veracity of this new evidence. Wilkerson thus sought and received permission to take Argo out of school to undergo a polygraph to confirm the truth of his accusations.

2. Based on its review of the evidence adduced at the habeas hearing, this Court concurs entirely with the factual statement by the Illinois Appellate Court in the course of affirming Argo's conviction, as reprinted in the Opinion, 673 F.Supp. at 284–85. All of the Findings that follow provide added detail as to the events of November 17 and 21, but they should not be viewed as differing with the Appellate Court's underlying factual findings (see 28 U.S.C. § 2254(d)).

3. In November Argo was 15–½ years old and enrolled at Bolingbrook High School. Though Argo was in learning disability classes, he was not mentally retarded and did not have any mental deficiency.

4. On November 17 Wilkerson met with Kanizar at her apartment in Bolingbrook. Wilkerson sought her permission to take Argo out of school for a polygraph examination with respect to the Green homicide investigation. Kanizar wrote this note to the school (R.Ex. 1):

> Please let Det. Wilkerson pick up Billy Argo from school today November 17, 1983. He has my permission to do so.

She also signed a consent form for the polygraph examination (R.Ex. 2). Kanizar's consents were wholly voluntary, and she made no request to accompany Argo to the examination.

5. Wilkerson went to the High School and left with Argo shortly after arriving. From their prior contacts Argo knew Wilkerson was a police officer investigating Green's death. With that knowledge, Argo voluntarily consented to go to the crime laboratory for a polygraph examination. Argo's demeanor at the time was entirely normal.

6. Once at the laboratory, Wilkerson left Argo in the downstairs lobby while Wilkerson went to speak with Luporini to provide a factual background of the case. When Wilkerson returned to the lobby he showed Argo the consent form (R.Ex. 2) previously signed by Kanizar, and Argo also signed the form to reflect his consent to the polygraph examination.

7. Argo then met with Luporini for the pretest interview and the polygraph examination. Throughout that time Luporini made no threatening statements to Argo, and he spoke with Argo in a conversational tone of voice.

8. After the examination Luporini met with Wilkerson and told him some of Argo's answers indicated deception. Wilkerson then met with Argo and told him of Luporini's conclusions. Another polygraph examination was scheduled because Argo had provided facts that differed from those he had previously given as to his involvement in the events leading to Green's death. Argo voluntarily agreed to undergo the further examination.

9. Wilkerson then drove Argo back to his apartment and, when there, spoke with Kanizar about the further polygraph examination. Kanizar did not speak with Argo after he had returned home that evening.

10. On November 21 Wilkerson again met with Kanizar at her apartment, asking her permission to take petitioner out of school for the second polygraph examination. Kanizar wrote the same kind of note as R.Ex. 1 to the school (R.Ex. 3), as well

---

**4.** Because all relevant dates were in 1983, no further year designations will be included in these Findings and Conclusions.

as signing a new consent form (R.Ex. 4). As before, the consents were voluntary, and Kanizar again did not ask Wilkerson if she could accompany Argo for the examination.

11. Wilkerson and Andalina then went to the High School and met with Argo. As Andalina said, Argo appeared "to be very calm and cooperative and willing to go to the polygraph examination." All three of them proceeded to the crime laboratory, arriving at about 1:30 p.m. As on November 17, Argo was left unescorted in the downstairs lobby, while Wilkerson and Andalina met with Luporini. And as before, Argo signed the consent form previously signed by Kanizar (R.Ex. 4).

12. Luporini then conducted the first part of the examination. About 40 minutes later Luporini told Wilkerson and Andalina that Argo had made some deceptive statements. Luporini then returned to meet with Argo for the second part of the examination. At approximately 4 p.m. Luporini told Wilkerson and Andalina that Argo had admitted stabbing Green himself.

13. Wilkerson and Andalina then met with Argo in the polygraph examination room and informed Argo of his *Miranda* rights, although they did not specifically tell Argo he could be charged with murder. Argo acknowledged that he understood his rights and had decided to waive those rights. Argo's demeanor had not changed from the time he was initially brought to the crime laboratory—he remained outwardly calm and continued to do so throughout the ensuing questioning. Wilkerson and Andalina then interviewed Argo at length, speaking with Argo in a conversational tone of voice. Argo was both cooperative and friendly throughout the period. During the interviewing Argo asked and was allowed to use the washroom.

14. After he had made various statements to Wilkerson and Andalina, Argo provided a detailed tape-recorded statement (R.Ex. 6) in which he admitted it was he who had stabbed Green. Argo gave the tape-recorded statement while in the crime laboratory's library, beginning at 9:15 p.m. and ending a few minutes after 10 p.m. At approximately 10:30 p.m. Argo was taken to the Bolingbrook Police Station.

15. It is especially difficult to determine, after the lapse of more than four years during which a young boy has become a young man,[5] whether statements given in the past were or were not voluntary in the legal sense. There is always the possibility that events, when viewed through the lens of elapsed time and the resulting increased maturity on Argo's part, might be distorted. For that reason this Court listened to the tape recording (R.Ex. 6, a piece of evidence frozen in time) with particular care. It disclosed an Argo answering questions calmly, fully and forthrightly in response to questions put equally calmly and with no overbearing tone of voice on the part of the interrogating officers. After a group of leading questions had been put to establish the background framework as developed during earlier questioning, Argo narrated the events in his own words. None of the indicia of involuntariness was even suggested in the tape—no indication was present that Argo's "will had been overborne" or that the statement was other than the product of Argo's voluntary, selfwilled decision to come clean at last about his having killed Green to prevent the latter's telling about Argo's having forced homosexual acts on an unwilling and struggling ten-year-old.

### Conclusions of Law [6]

1. Voluntariness of Argo's November 17 and 21 Statements

 As the Opinion, 673 F.Supp. at 289–90, 291 and 292 reflects, the key issue that

---

5. Argo, 15–½ years old at the time of his November 1983 statements, was 19–½ at the time of the habeas hearing before this Court. It would obviously be entirely possible for someone to reflect substantial maturity at the time of the hearing without that fact necessarily being probative of his level of sophistication or matu-

rity at the critical date—when his challenged statements were taken.

6. This Court ordinarily states Conclusions in numbered paragraphs, just as it does Findings. In this instance the issues lend themselves to more felicitous treatment in a narrative discus-

informs each of the still-open legal questions is the voluntariness vel non of Argo's November 17 and 21 statements. To that end this Court must consider the effect the totality of the circumstances had upon Argo's will (*Holleman v. Duckworth*, 700 F.2d 391, 396 (7th Cir.1983)). *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (citation omitted) defines the "test of voluntariness" this way:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) may well be perceived as having ushered in a more restrictive regime for petitioners such as Argo:

> We hold that coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.

*United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir.1987) has read and applied that requirement as prescinding the kind of judicial inquiry that has previously looked at a petitioner's personal characteristics in the manner prescribed by *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). As *Rohrbach* put it regarding the defendant in that case: [7]

His argument is not that the agents (or anyone else, for that matter) used coercive tactics, but that his personal characteristics, including minimal formal education and a history of alcohol and drug abuse and of suicide attempts, are indicative of an easily overborne will. That argument is legally indistinguishable from the argument unsuccessfully advanced by the defendant in *Connelly*. Although we believe that personal characteristics such as those on which Rohrbach relies would be relevant to the voluntariness issue once coercive police activity has been shown, *Connelly* makes it clear that such personal characteristics of the defendant are constitutionally irrelevant absent proof of "coercion brought to bear on the defendant by the state."

Whether (1) under the more stringent approach counseled by *Colorado v. Connelly* as construed by *Rohrbach* or (2) under a reading of *Colorado v. Connelly* under which "coercive activity" may in part be a function of the personal characteristics of the petitioner, the answer here is the same. There is no persuasive evidence of the use of coercive police activities to elicit Argo's statements. Nor does "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation" (*Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047)—lead to any conclusion that Argo's "will was overborne" or "his capacity for self-determination critically impaired." All the Findings compel that conclusion.[8]

In sum, based upon the evidence presented at the habeas hearing, Argo is not enti-

---

7. sion form, though such a form is more typical of judicial opinion writing.

 Neither litigant has treated with the issue dealt with in the quoted language from *Rohrbach,* and this Court's own research has disclosed no post-*Colorado v. Connelly* decisions from our own Court of Appeals dealing with the subject. *Smith v. Duckworth,* 840 F.2d 920 (7th Cir.1988) is an unpublished order that cites *Rohrbach* and no Seventh Circuit opinions on the issue—but because such unpublished orders may not be cited as authority under Circuit Rule 53, *Smith* provides nothing more than some probative indication that a search of authority by the Court

of Appeals itself has also failed to turn up relevant Seventh Circuit authority. This Court therefore cites *Rohrbach* because it does discuss the question and is relevant authority, not because it has been endorsed by our Court of Appeals.

8. This Court's just-stated conclusion should be understood as embracing each of (1) the Luporini questioning and polygraph examinations (on both November 17 and 21), (2) the November 17 Wilkerson questioning and Argo's resulting statements and (3) the November 21 Wilkerson–Andalina questioning and Argo's resulting statements.

tled to habeas corpus relief on the claim that his statements on either of those dates were involuntary. That disposes of his first contention, and it impacts significantly on his other claims (which require only brief discussion).[9]

### 2. Validity of Argo's November 21 Miranda Waiver

■ Argo's initial claim included, as an alternative ground for partial suppression (Pet. 50–51), the contention that his November 21 waiver of his *Miranda* rights was invalid. At the habeas hearing Argo shifted ground, testifying he did not receive *Miranda* warnings at all. This Court rejects that in factual terms (see Finding 13) and therefore proceeds to the validity of his *Miranda* waiver, as the Opinion, 673 F.Supp. at 291 had anticipated.

Once again a critical issue is one of voluntariness, much like the analysis just engaged in during the preceding discussion. But on the subject of waiver there is also a second and distinct inquiry: whether the waiver was also knowing and intelligent (*Perri v. Director, Department of Corrections*, 817 F.2d 448, 452 (7th Cir.1987); accord, *Bryan v. Warden, Indiana State Reformatory*, 820 F.2d 217, 221 (7th Cir. 1987)).

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) states the dual test in these terms:

First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

And as the Opinion reflected, the special situation of a minor brings into play the considerations articulated in *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979):

This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and [inquiry] into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

Just as he failed on the voluntariness issue discussed in the preceding section, Argo has tendered nothing persuasive to challenge the conclusion that he met the waiver standards identified in both *Moran* and *Fare*. Everything points to both an "uncoerced choice" and "the requisite level of comprehension" on his part. Argo's *Miranda* waiver, like his statements to the police, was clearly knowing, intelligent and voluntary in the legal sense.

### 3. Excluded Evidence

Both Argo's and respondent's post-hearing submissions have inexplicably failed to address Argo's argument (Pet. 54–55) that his constitutional right to present a defense was violated by the trial court's in limine exclusion of Schwake's altered traffic citation. That issue was specifically left open by the Opinion, 673 F.Supp. at 292, precisely because this Court found the potential harmlessness of the exclusion beyond a reasonable doubt (as required by *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1016–17 (7th Cir.1987)) was a direct function of the admissibility of the November 17 and 21 statements that Argo challenged as having been involuntarily elicited.

This opinion will not repeat the analysis spelled out in the Opinion, 673 F.Supp. at 292. Suffice it to say this is the situation at present:

1. Argo was convicted on "overwhelming evidence ... stemming from his confession" (the language of the Illi-

---

**9.** This ruling not only blocks Argo's effort to suppress his statements as unconstitutionally obtained but also forecloses any attempt to bar admissibility of the murder weapon (Argo's

knife), the location of which as a result of his statements was attacked as "fruit of the poisonous tree."

nois Appellate Court, 133 Ill.App.3d at 430, 478 N.E.2d at 880).

2. Contrary to the Illinois Appellate Court's conclusion (*id.*) based on a factual misapprehension, the alteration in the parking ticket may be viewed as circumstantial evidence creating an inference in Argo's favor, rather than one that could be argued for by either side (see *id.* and the Opinion, 673 F.Supp. at 292).

Even so, the situation is one in which Argo's confession to the crime is both damning and compelling. At best the parking ticket needs an inferential building-block process to create even any hint of doubt of Argo's guilt. It cannot fairly be said the exclusion of that evidence rises to the level of an "[e]rror of constitutional magnitude" (*Savory*, 832 F.2d at 1016).

In short, whatever error may be found in the trial court's exclusionary ruling is "harmless beyond a reasonable doubt" (*Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Savory*, 832 F.2d at 1016–17). Like the issues discussed earlier in these Conclusions, this one does not entitle Argo to habeas relief.

\* \* \*

None of Argo's contentions succeeds. His petition for a writ of habeas corpus is dismissed on the merits.

